## Ex parte STEELE.

## Ex parte BIRCH.

### (District Court, N. D. Alabama, S. D.   August 5, 1908.)

**1. BANKRUPTCY—JURISDICTION—ADJUDICATION.**

Ex parte Steele (D. C.) 156 Fed. 854, and subsequent case under same title, held not to be the law of the district.

**2. SAME—"JUDGE."**

"The judge," who must make the adjudication, reference, and dismissal of petitions, under the bankruptcy statute, by express terms of Act July 1, 1898, c. 541, § 1, subd. 16, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3419), is defined to be "a judge" of the bankruptcy court.   Where there are two judges, either may hold a court of bankruptcy and perform all the duties

thereof in the same place or at a different place within the district, while the other judge is also holding a court of bankruptcy.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 4, pp. 3823-3826; vol. 8, p. 7695.]

3. JUDGES—CREATION OF OFFICE—ADDITIONAL DISTRICT JUDGE.

Act Feb. 25, 1907, c. 1198, 34 Stat. 931 (U. S. Comp. St. Supp. 1907, p. 187), providing for "a United States district judge for the Northern district of Alabama," does not repeal Act Aug. 2, 1886, c. 842, 24 Stat. 213 (U. S. Comp. St. 1901, p. 449), and prior laws which expressly confirm the jurisdiction of the then "present district judge of the several districts," and his successors, in the Northern and Middle districts. Both the words of the statute, and the surrounding conditions, if we could look to them, show that the legislation was merely "auxiliary" and intended to add another judge in a district, the business of which was greater than one judge alone could dispatch.

4. SAME—POWERS OF JUDGE.

Where there are two district judges of the same district, they have, unless the statutes relating to them otherwise provide, equal rights and authority, and in some matters joint rights and authority, and each judge is legally and morally bound to respect the rights of the other. The absence of one of them from the district, or the fact that one alone holds the court, cannot justify that judge either in law or morals in overriding the rights or authority of a colleague, or give legality to his appointment or removal of court officials, without the consent of the absent judge.

5. SAME—POWERS OF FEDERAL JUDGES.

Under Act Aug. 2, 1886, c. 842, 24 Stat. 213 (U. S. Comp. St. 1901, p. 449), the judge of the Northern and Middle districts, being equally the judge of both districts, can when in either exercise some judicial functions, regarding matters in the other district, without being personally present therein. The validity and propriety of such orders depend upon the matters to which they relate.

6. BANKRUPTCY—COURTS OF BANKRUPTCY—ORDERS OF JUDGE—APPOINTMENT OF REFEREE.

The court of bankruptcy is in a strict sense a court of equity, and a judge who is a judge of two districts may make an order to be entered in the court of either, as to a mere administrative matter—such as the appointment of a referee—although not personally present in the court, if he be at the time of the making of the order in either district.

7. JUDGES—APPOINTMENT OF ADDITIONAL JUDGE—POWER.

The commission of "a judge of the Northern district" having expired by adjournment of the Senate, without action upon his nomination, on May 30, 1908, "the judge of the Northern and Middle districts" again became the sole judge of the Northern district, and so continued until another appointment and qualification occurred. An order made and entered upon the minutes by direction of the judge of the Northern and Middle districts, appointing a referee in that interval, is a legal and valid act of a sole judge of the district, and the reappointment of "a judge of the Northern district" and his qualification thereafter cannot destroy the validity of the appointment, or authorize him, without the consent of the other judge, to vacate or annul it.

8. APPEAL AND ERROR—MOOT CASE.

When there is a real controversy, whether there be two judges of a district, and if so, as to their respective power in removing or appointing court officials, a case actually made concerning it could not be treated as a "moot case" in an appellate court, because the judges agreed in advance as to the steps actually taken to present the issue.

9. COURTS—CONFLICTING AUTHORITY—DUTY OF JUDGES.

It is particularly incumbent upon judicial officers to set an example of order, and when differences arise between them as to their powers, in matters in which the public have an interest, it is their duty to take such friendly steps in the exercise of their respective claims as will present the

issue in such shape that a decision can be obtained in a higher court with the least possible delay and friction. Such amicable actions, so far from being an object of censure, are always encouraged and approved by the courts, and the refusal to join in such amicable steps is not excused on the plea that such an agreement would offend the policy of the law.

**10. SAME—DUTIES OF JUDGES.**

In November, 1907, there were two judges of the Northern district, and S. was appointed a referee in bankruptcy by one of them without the consent of the other, who removed him, whereupon the judge appointing him revoked the order of removal. Afterwards, in 1908, the other judge, at a time when he was the sole judge, without interfering with S., appointed B. a referee, and made an order requiring the bankruptcy business to be divided equally between them, except when one of the judges for special reasons in a case ordered otherwise. Two days afterwards he repeated the order, without the consent of the other judge if he had then qualified. Thereupon his colleague, having qualified under a new appointment, revoked both these orders. *Held*, that the judge whose authority was thus ignored by his colleague, with due regard to the judicial station, could not retort by further orders revoking those of his colleague as fast as made, but pursues the better course in recommending to his appointee to take steps to revise the last order concerning him in the Court of Appeals, which has authority to do so under Bankr. Act July 1, 1898, c. 541, § 24, 30 Stat. 553 (U. S. Comp. St. 1901, p. 3431).

(Syllabus by the Court.)

**11. WORDS AND PHRASES—"MOOT CASE."**

A "moot case" is one which seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 4577.]

See 161 Fed. 886.

Prior to August 2, 1886, there was one district judge appointed for the Northern, Middle, and Southern districts of Alabama, under section 552 of the Revised Statutes (U. S. Comp. St. 1901, p. 447). That judge was the Honorable John Bruce. He was appointed and confirmed as judge of "each of the districts" in the state on the 25th of February, 1875, and so continued until the Act of August 2, 1886 (24 Stat. 213, c. 842 [U. S. Comp. St. 1901, p. 449]), when a judge (Hon. H. T. Toulmin) was appointed for the Southern district under the Act of August 2, 1886, the second section of which provided "that the jurisdiction of the present district judge for the several districts of Alabama and his successors shall hereafter be confined to the Northern and Middle districts of said state." Judge Bruce departed this life in October, 1901. Thomas G. Jones, having been duly appointed and confirmed, was commissioned and qualified as "judge of the Northern and Middle districts" on December 17, 1901. On February 25, 1907, an act was approved providing "for a United States judge for the Northern judicial district of Alabama," which enacted "that the President of the United States by and with the advice and consent of the Senate shall appoint a district judge for the Northern judicial district of Alabama, who shall possess and exercise all the powers conferred by existing law upon judges of the District Courts of the United States, and who shall possess the same powers and perform the same duties, within the said Northern judicial district of Alabama, as are now possessed by and performed by district judges of the United States in any of the judicial districts established by law, and he shall receive the same compensation now or hereafter prescribed by law in respect to other district judges of the United States; and provided that after the appointment the judge appointed under this act shall reside at Birmingham in said district." Act Feb. 25, 1907, c. 1198, 34 Stat. 931 (U. S. Comp. St. Supp. 1907, p. 187).

On April 7, 1907, Oscar R. Hundley was nominated by the President as **judge** of the Northern district and commissioned as such in the recess of the

Senate. He qualified a few days thereafter, and entered upon the discharge of his duties as judge of the Northern district. Judge Hundley, as well as the Executive Department, the circuit judges, and the bar and litigants recognized Thomas G. Jones as a judge of the Northern district under his commission as "judge of the Northern and Middle districts," and he acted as such whenever necessary. Judge Hundley refused to enter into any arrangement with him as to the appointment of officers, or to definitely commit himself in any way as to his intentions, in a correspondence lasting some weeks, or even as to a friendly test case as to the respective powers of the judges. The substance of the correspondence between the two judges on this point is set out in the opinion. The terms of the two referees then at Birmingham expired, respectively, on the 10th and 13th days of November, 1907, and they went out of office then; Judge Jones disclaiming authority to appoint without the consent of Judge Hundley, and the latter having rejected a proposition either to retain the referees as they were, or to appoint a third referee whom Judge Hundley could name, or, if that were not agreeable, for each of the judges to name one of the referees. On November 1, 1907, while holding court at Huntsville, Judge Hundley appointed Nenian L. Steele a referee in bankruptcy in Birmingham without the knowledge or consent of Judge Jones, who, on the 5th of November, 1907, in open court at Birmingham, revoked the order appointing Steele without Judge Hundley's consent, but was compelled at that time to return to duty in the Middle district. Judge Hundley set aside the order revoking Steele's appointment, and in an opinion reported in Ex parte Steele (D. C.) 156 Fed. 654, justified the refusal to make up a test case on the ground that it would be a moot case. Thereafter Steele continued as sole referee in bankruptcy at Birmingham.

Judge Jones, pending a bill introduced in Congress to legislate him out of the Northern district, made no further order as to Steele. Congress adjourned on the 30th of May, 1908, without ever having acted on the bill, and the Senate took no action on Judge Hundley's nomination. Thereupon Judge Jones on that day, being then the sole judge of both districts, as soon as Congress adjourned, and while in the Middle district, made an order, and sent it to the clerk at Birmingham to be entered there, appointing Alex. C. Birch a referee in bankruptcy at Birmingham, without disturbing Steele, but requiring the clerk, unless otherwise directed by a judge of the court, to refer the even-numbered cases in bankruptcy to one of the referees and the odd-numbered cases to the other. On June 1, 1908, Judge Jones in open court at Birmingham, repeated the same appointment and order without Judge Hundley's consent, if he had then qualified, under a new recess appointment. Judge Hundley set aside that order as improvidently made, and absolutely void, holding, in an opinion afterwards reported (In re Steele [D. C.] 161 Fed. 886), among other things, that the act of Congress creating courts of bankruptcy provided for one court only in the territory prescribed, and that the judge of the Northern and Middle districts had no authority to hold a court to appoint a referee in bankruptcy, when Judge Hundley was holding court in the district. Thereupon Judge Jones advised Referee Birch to seek a review of the order under section 24 of the bankruptcy statute (Act July 1, 1898, c. 541, 30 Stat. 553 [U. S. Comp. St. 1901, p. 3431]), as he (Judge Jones) could not always remain in the Northern district, and Judge Hundley avowed a purpose to revoke any orders made by Judge Jones concerning a referee in bankruptcy. Pending decision by the Court of Appeals on Referee Birch's petition, Judge Jones refused to make any further orders in the matter, esteeming that mode of settling a legal difference was not admissible with due regard for the public interests and the proprieties of the judicial station.

JONES, District Judge (after stating the facts as above). The publication of my colleague's opinions in Ex parte Steele, in the official reports and in the newspapers, and the conflicting orders growing out of a mere administrative matter, as to which we have joint authority, in the appointment of a referee at Birmingham, justify the filing at this time of an extended opinion as to the law of the case. Some ex-

traneous matters emphasized more than once in an invidious way, in both those opinions, render it highly proper also to put on record a plain and full statement of the facts regarding a controversy, which, in the unseemly form it has now assumed, the writer has exhausted all honorable means to avoid.

1. Of course, if my colleague be the sole district judge of the Northern district there can be no room for disputation here. If, however, there be two judges, they have equal and in some matters joint rights and authority, and each judge is legally and morally bound to respect the rights of the other. My colleague declares "any expression of opinion here upon that question would be mere dictum." No known definition of "dictum" supports that view. Whether there be one or two judges of the Northern district lies at the very threshold of the case. No judgment can be rendered as to the legality of the appointments and removals here at issue, without first ascertaining what judges had a right to participate in the making of those orders, and any judgment as to their validity or invalidity inevitably involves a conclusion and judgment on that point. Both opinions in Ex parte Steele proceed on the hypothesis that there are two district judges of the Northern district. The first opinion asserts that the "judge of the Northern and Middle districts" cannot, without the consent "of a judge for the Northern district," remove Mr. Steele, who was appointed without the consent of the judge of the Northern and Middle districts. The last opinion asserts that "a judge of the Northern district" may rightfully remove Mr. Birch, without the consent of the "judge of the Northern and Middle districts," who made the appointment without the consent of "a judge for the Northern district." The one opinion is cited to sustain the other.

My colleague's claim of right to remove Mr. Birch is largely, if not wholly, rested, at last, on the strange theory, to quote from the last opinion, conceding that there are two judges of the Northern district, yet "while he (Hon. O. R. Hundley) is in the district, and the other without the district, my decrees and orders are supreme," until some higher court reverses them. The solemn declaration is made that a judge, whom the law makes a judge equally for the Northern and Middle districts, when he remains personally in the Northern district, may have some rights which, perhaps, ought to be respected; but the very moment that judge goes into the Middle district, where the law also requires him to go, and therefore is not physically present in the Northern district, all the rights and relations of that judge to that district are forfeited until he again physically returns within its boundaries, and that the other judge, in the mean time, ipso facto, is invested in the Northern district with "supreme" power to loose and bind and confiscate the power of the absent judge. This is strange doctrine to come from the bench. All laws, human and divine, forbid judges, as well as other men, to seize upon that which is another's because he is not present to protect it, though the captor is where he can conveniently take and has the physical power to make the seizure. Even if a judge had that power, it would not absolve him from the high duty of settling a legal dispute between judges in an orderly way, or excuse the rejection of an offer, by

means of a friendly test case, to avoid the unseemliness of the situation now presented.

The power of appointment in this case is a joint power, relating to an administrative matter, which can only be exercised lawfully with the consent of the majority of those in whom the power is reposed. The physical power of a single judge while holding court alone to enter orders at will does not carry with it the legal right to usurp the powers of the absent judge. On direct attack, at least, the court's orders as to the appointment or removal of an officer are illegal, when it is shown that only one of the two judges participated in the act, contrary to the will of the other judge, who was willing and able to act. No one ever claimed that a district judge, although he frequently holds the Circuit Court alone, and when presiding therein may exercise all the powers thereof, could lawfully appoint or remove the circuit clerk against the wishes of the circuit judges. So far as the writer can learn, there is no case in the judicial annals of the United States where a district judge has attempted such a thing. The rightfulness or legality of such an appointment or removal made by a district judge when sitting alone, against the wishes of the circuit judges, could not be excused or justified on any legal theory that the physical power of the district judge at such time to usurp the legal prerogative which the law vests in the other judges, carried with it the legal power to do so. "Right, not might," determines the validity of acts, at least in courts of justice. The same principle governs the like case here. The statutes prescribe neither mode nor stated time for the appointment of court officials. When a court is held to make an appointment, all the judges having a right to participate must have notice and opportunity to attend and vote. Otherwise, the appointment will be invalid, and, when made by a court presided over by one only of two judges who disregards the wishes of the other, the appointment is a nullity, since there was no quorum to act upon the matter. Smyth v. Darley, 2 House of Lords Cases, 789; Doernbecher v. Columbia City Lumber Co., 21 Or. 573, 28 Pac. 899, 28 Am. St. Rep. 766; Com. v. Cullen, 13 Pa. 133, 53 Am. Dec. 450.

2. No justification can be found, as my learned colleague supposes, for his mode of resisting Mr. Birch's appointment by my method in resisting Mr. Steele's appointment. My action throughout was defensive, not offensive, against the vaunting of "supreme" authority, exercised in such form that no other mode of resistance was open. It did not imply any claim of sole authority, but did assert equal authority with a colleague, and the right to remove an officer without his consent, if he could appoint him without mine. No opinion was filed in the case or report of it then made for the official reports, the writer contenting himself with a statement from the bench, since it was not thought a difference between judges over a court officer deserved or should have any permanent place in judicial literature. The remarks then made from the bench deprecated the presentation of the issue by a collateral attack by one of the judges on the authority of the other, and expressed regret that a friendly test case had not been agreed on, which would have obviat-

ed the necessity for one judge revoking or continuing to revoke the orders of the other. It was an anomalous situation with which the writer had to deal. If he allowed the orders regarding Steele's appointment to go unchallenged, there was no way in which the validity of that appointment could be raised. Steele, in that event, would appear to be properly appointed. No appeal from one of his decisions would raise the authority of one judge to appoint without the consent of the other. A quo warranto would not lie to test the right, not only because the minutes then would show a proper appointment, but also because the statutes provide an exclusive mode for appointing and removing referees. The judge whose authority was invaded was not the aggrieved party, in the legal sense, and could not become one in any appellate proceeding to revise an ex parte order made by a brother judge. Steele, so long as the order appointing him was not challenged by the writer, would take no steps to revise the order. There was no way the writer could obtain a decision upon the law, unless he appointed some one in Steele's place, who could revise an order by my colleague revoking his appointment. While the writer knew he had as much right to disregard his colleague in making an appointment as that colleague had to disregard the writer, he had disclaimed such authority on the part of either. It was under these circumstances only that the writer declared the revocation of Steele's appointment was the "proper way" to deal with the matter, when a friendly test case had been refused.

A friendly test case could have been easily arranged at that time, with any co-operation on the part of my colleague, which did not necessitate any revoking order by him. A fine could have been imposed upon Steele for meddling with the bankrupt business, or for disobedience to an order to refrain from acting as referee, or the clerk might have been fined for refusing to obey the order of one or the other of the judges as to the reference of cases in bankruptcy, and on writ of error from the Court of Appeals the matter would have gone there and been settled. Other ways were open if a friendly test case had not been rejected by my colleague; but these steps, in the absence of such understanding, the writer did not feel were open to him, since it would have been scandalous, save as a last alternative in resistance to usurpation, for one judge to impose a fine upon an officer or person for doing that which another judge of the court asserted he had a perfect right to do. The situation when Mr. Steele was removed was not at all parallel to that when Mr. Birch was appointed by me. In the one case, my colleague was asserting "supreme" power; in the other, the writer was only insisting upon equal authority. In the one instance, a friendly test case was refused; in the other, it was offered.

Moreover, if the precedent set by me in removing Steele was wrong and justified a revocation of my order, my colleague's own action in that case was a precedent which forbade his removal of Birch, and would, on his own reasoning, be illegal, and justify an order revoking his order concerning him. Ex parte Steele cannot be the "law of the district" for my colleague's appointee, without being

the "law of the district" for mine, when both were appointed and removed under the same identical circumstances, save as to the appointment under the order of May 30th, made at a time when my colleague was not a judge of the district.

3. The learned judge's excuse for his refusal to join in the "making up of a test case" is that it would prevent the very adjudication which was desired. He says:

"Any such case made up by agreement between the judges would, indeed, be but a moot question. which any court before whom the matter was pending would promptly dismiss as such. This proposition is so well understood by the bench and bar that citation of authority to sustain it is unnecessary."

—and the writer adds impossible. Ex parte Steele stands alone on that point. No case in the books supports it. It is universally understood by the bench and bar, on the contrary, that a moot case is one which seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy. The only way a disputed right can ever be made the subject of judicial investigation is, first, to exercise it, and then, having acted, to present a justiciable controversy in such shape that the disputed right can be passed upon in a judicial tribunal, which can pronounce the right and has the power to enforce it. When there is an actual, bona fide contest as to a legal right, an agreement to put the case, when made, by actual exercise of the right and resistance to it, in such shape that the right can be readily determined by the court, especially when the dispute concerns a matter of public moment, which should be speedily settled, has never been condemned by the courts. It is a common, everyday practice in every state of the Union. The noted Legal Tender Cases were made up in that way. A prominent instance of that kind in Alabama is Ex parte Dement, 53 Ala. 397, 25 Am. Rep. 611. Only the other day the state authorities agreed with certain taxpayers in advance as to the mode of presenting a test case to raise the constitutionality of the franchise tax. Certainly there is a real controversy here whether there be one or two judges of the Northern district, and, if there be two, as to the mode in which their power can be exercised, after each of the judges claiming the power has exercised it, and the other judge has disputed the right and resisted the exercise of the power. Can it be possible that this case would cease to be a real controversy which the court would not consider, if it were shown that the persons in whom the power is vested, and disputing about it, knowing there was an irrepressible contest ahead, had agreed in advance what acts they would do in the exercise of the disputed right in order to make a case, and thereby obtain a speedy judgment of the court upon it? When judges differ among themselves, as to the measure of their respective duties and rights, the law does not compel them to raise the black flag as to the mode in which the issue shall be settled, by forbidding all friendly concert to determine what steps each shall take, which, when taken, will present an actual case for review, in such form

as will involve the least friction and injury to the court and the public interests. On the contrary, such agreements promote good morals and sound public policy and are always favored.

The Supreme Court of the United States, in Lord v. Veazie, 8 How. 255, 12 L. Ed. 1067, discusses the question. There, it dismissed a case, "not that the proceedings were amicable, but there was no real conflict of interest between them, and the plaintiff and defendant had the same interest." Chief Justice Taney, speaking for the court, said:

"But an amicable action, in the sense in which these words are used in courts of justice, presupposes that there is a real dispute between the parties concerning some matter of right, and in a case of that kind it sometimes happens that, for the purpose of obtaining a decision of the controversy, without incurring needless expense and trouble, they agree to conduct the suit in an amicable manner; that is to say, that they will not embarrass each other with unnecessary form or technicalities, and will mutually admit facts which they know to be true, and without requiring proof, and will bring the point in dispute before the court for decision, without subjecting each other to unnecessary expense or delay. But there must be an actual controversy, and adverse interests. The amity consists in the manner in which it is brought to issue before the court, and such amicable actions, so far from being objects of censure, are always approved and encouraged."

The courts all hold, in varying language, the doctrine of the Supreme Court of Rhode Island, that:

"A 'moot case' is one which seeks to determine an abstract question which does not rest upon existing facts or rights. Where a concrete case of fact or right is shown, we know of no principle or policy of law which will deprive a party of a determination, simply because his motive in the assertion of such rights is to secure such determination. It is a matter of common practice. Most of the cases of trespass to try titles are of this sort." Adams v. Union Railroad, 21 R. I. 134, 42 Atl. 515, 44 L. R. A. 275–277.

4. The paramount question is, however, whether there are two district judges or only one for the Northern district. To properly answer this question requires an examination of prior laws constituting courts and judges of the Northern district; the terms of the later law providing for the appointment of "a judge for the Northern district," and, if the language of the statute leaves the intent in doubt, to consider the evil which called forth the later statute, and what construction best remedies the evil it was designed to cure.

## Statutes Relating to the Judges in the Northern District.

Prior to the act of August 2, 1886, there was "one district judge" in Alabama who was "district judge in each of the districts included in the state," and required to reside in "some one of said districts." Rev. St. § 552 (U. S. Comp. St. 1901, p. 447). Then, as now, there were three judicial districts, the Northern, Middle and Southern. Act Aug. 2, 1886, c. 842, 24 Stat. 213 (U. S. Comp. St. 1901, p. 449), provided for the "appointment of a district judge for the Southern judicial district of Alabama," and that "the jurisdiction of the present district judge for the several districts of Alabama and his successors shall hereafter be confined to the Northern and Middle districts of said state." The district judge of the several districts of Alabama at that time was the Honorable John Bruce. Upon his death in 1901, the writer was appointed, confirmed, commissioned, and qualified, as

"judge of the Northern and Middle districts of Alabama," and thus became the "successor" of Judge Bruce "in each of the districts included in the state," from which the act of August 2, 1886, did not exclude him. That act excepted the Southern district only from the jurisdiction of the "successor" of Judge Bruce, and expressly continued former laws which made him judge in each of the remaining districts, "the Northern and Middle." Clearly, therefore, the writer is still judge of the Northern district, unless his jurisdiction has been withdrawn by subsequent legislation.

The situation which gave rise to the act providing for "a district judge for the Northern district of Alabama" is well known. At that time there was only one judge for both districts. He was required to hold court twice a year in five places in the two districts, or ten terms a year. A special act required six months open court at one of these places (Birmingham) in the Northern district. The volume of business had constantly increased, keeping pace with the industrial development of the country. Foreign corporations owned and operated trunk lines of railway in every part of the district, and other foreign corporations conducted therein industrial and manufacturing establishments on a very large scale. When sued in the state courts they transferred the cases to the federal court. Such suits constituted the great bulk of the litigated civil business. The bankruptcy law also created much business, and the trial of criminal cases consumed a large part of all the time possible to devote to the several terms. For some years the condition of the dockets in the Northern district had necessitated the calling in of outside judges. The business of the two districts could not be equitably divided between two judges, by giving each a separate district, since there was more business in one district than in the other, and more work than one judge alone could do in the Northern district. The judge of the Northern and Middle districts had some spare time from his duties in the Middle district. The State Bar Association and a great majority of the local bars finally recommended, as the best solution, the appointment of a district judge who should be a judge for both the Northern and Middle districts. A small minority of the local bars preferred the addition of a district judge in the Northern district, to work there in conjunction with the judge already there, while two or three local bars favored a sole judge for the Northern district. The writer favored the plan recommended by the State Bar Association and the bulk of the local bars. He deemed it unjust to advocate any arrangement which would give the new judge an undue share of the burden, though such an arrangement would have been preferable from a mere personal standpoint, since it would save considerable personal expense, and not necessitate frequent absences from home. The passage of a bill was long delayed for reasons not now material.

### The Act of February 25, 1907.

Finally, a bill was approved on the 25th of February, 1907, providing for "a United States judge for the Northern district of Alabama." That act, following the title, provides simply for "a United States judge for the Northern district of Alabama," who shall "possess and

exercise all the powers conferred by existing laws upon judges of the District Courts of the United States, and shall possess the same powers and perform the same duties, within said Northern district of Alabama, as are now possessed and performed by district judges of the United States in any of the judicial districts established by law," and requires the new judge, after his appointment, to reside at Birmingham. Act Feb. 25, 1907, c. 1198, 34 Stat. 931 [U. S. Comp. St. Supp. 1907, p. 187]).

Upon examination of the statute, seeing that it did not add another judge for both districts, the writer earnestly endeavored before the bill passed the Senate, which was the earliest opportunity, to have it amended so as to relieve the judge of the Northern and Middle districts from any further duty in the Northern district. Senator Pettus, the Alabama member of the Senate Judiciary Committee, declined so to amend the bill, and the efforts of some of our delegation in the House to induce him to change his mind, were without avail.

If the act of 1907 took away the writer's jurisdiction in the Northern district, it was his duty to stay out of the district, unless specially designated to go there. If not, it was his duty to give such time as he could in connection with his duties in the Middle district, to the Northern district. The first practical phase of the question was presented as to some submitted cases undecided at the time of the passage of the act. The attorneys in one of them submitted that doubt might possibly arise as to the validity of a decision by me after the appointment of the new judge. The judge of the Northern and Middle districts, accordingly, wrote the Attorney General under the date of February 24, 1907, suggesting that the appointment be delayed for 10 days, in which time the cases could be disposed of. In reply the Attorney General wrote:

"This view has not been previously suggested to the Department, and at first sight the language of the bill read in connection with the act of August 2, 1886 (24 Stat. 213), would hardly seem consistent with such an interpretation. The question has not been submitted to the Attorney General officially, so there is nothing authoritative in the foregoing intimation as to the Department's views, but the suggestion mentioned does not seem, upon such consideration as it has been possible to give it, sufficiently well founded to justify any action by the Department based upon the assumption of its proving accurate."

At the same time the writer sought advice from a number of eminent lawyers in different parts of the state and from brother judges. With the exception of one of the lawyers, who hesitatingly reached the opposite conclusion, they all unhesitatingly advised that the act simply put another judge in the Northern district, without in any way otherwise interfering with the power and duty of the judge of the Northern and Middle districts, in the Northern district. It was understood, of course, that this advice was persuasive and not in any sense authoritative, and it is mentioned only as corroborative of the correctness of the results to which my own independent investigation led, which was that there was no doubt of the soundness of that advice.

Repeals by implication are not favored. If by any reasonable construction prior and subsequent statutes can each have some fair field of operation, that construction must prevail over any which denies all

effect to former laws on the same subject. Justice Story, in Wood v. United States, 16 Pet. 362, 10 L. Ed. 987, states the universally accepted rule. In that case he uses the following language regarding the prior legislation there, which is strictly applicable here to the act of August 2, 1886, and prior laws:

"That it has not been, expressly or by direct terms, repealed, is admitted; and the question resolves itself into the more narrow inquiry whether it has been repealed by necessary implication. We say by necessary implication, for it is not sufficient to establish that subsequent laws cover some or even all of the cases provided for by it, for they may be merely affirmative, or cumulative or auxiliary; but there must be a positive repugnancy between the provisions of the new law, and those of the old, and even then the old law is repealed by implication, only pro tanto, to the extent of the repugnancy."

This doctrine is quite as broadly stated by the Supreme Court in the subsequent cases of Frost v. Wenie, 157 U. S. 58, 15 Sup. Ct. 532, 39 L. Ed. 614, and Ex parte Crow Dog, 109 U. S. 557, 3 Sup. Ct. 396, 27 L. Ed. 1030. The only possible way in which effect pro tanto can be given to the act of August 2, 1886, and prior laws on the subject, and the act to provide for the appointment of "a judge for the Northern district," is to hold that the later act is "merely cumulative, or auxiliary," and does not repeal the former laws, but is intended merely to add another judge to work in the Northern district with the judge already there. The statute contains no express words of repeal of former laws. There is nothing on which to work out a total repeal by implication. The statute makes not the slightest reference to the district judge already in the district, or as to any change in the nature of his powers and duties as specially prescribed in that district, by the act of August 2, 1886, and prior laws. Passing strange then, if Congress, which, of course, was aware of the former laws, in legislation upon that very subject, had intended to displace the existing judge, that the statute did not in so many words repeal the act of August 2, 1886, or use some expression inconsistent with any operation of prior statutes, in the same territory, regarding the same subject-matter. The act referring to the new judge whom it creates does not even use the article "the," but speaks of "a district judge." There are often two district judges in the same district. There is no hint in any term or word in the later act of any purpose to create a separate, exclusive, or sole judge. As if to exclude the idea that Congress intended that "a judge," for whom the later statute provided, should succeed to the powers and jurisdiction of the old judge in the Northern district, the act is careful not to give the new judge the power of the old judge, but only like powers, the "same powers" as possessed by district judges in any of the judicial districts.

This careful language is used in reference to a district in which Congress knew there was at the time the "judge of the Northern and Middle districts," a judge who himself comes clearly within the designation "district judges in any of the districts" who was vested with the same general powers and duties as district judges in "any judicial district." The new judge was to go into that district, where the other judge had these general powers, because Congress felt there should be two district judges. The powers of the court in the Northern dis-

162 F.—45

trict were neither enlarged nor diminished. No new court was created. The court and its jurisdiction remain as they were, and the relations of the judges to the court and to each other are not changed in any way, as fixed by the general law applicable to all districts. The plain meaning of the words used generally, as descriptive of the power, "in any of the judicial districts, established by law," is that the new judge shall have in the Northern district, which is one of these districts, the "same power" therein, as judge, which any judge would have in any district where there are two judges. The context clearly and inevitably fixes that meaning. Manifestly, it is an unsound contention that a judge in a district where there are two judges must have sole power therein, because if he were in another district, where he was sole judge, he necessarily would have sole power therein. To sustain such a position, leaving out of view for the present the act of August 2, 1886, we must find some, "any," district, where the law is that, although there be two judges, yet one of them is vested with superior authority over the other, or may exclude the other judge. That is not the case in "any" of the judicial districts established by law. A contrary holding would also deny all effect whatever to the act of August 2, 1886, which expressly confirms the continued exercise of the powers of the judge already in that district, as conferred by general laws which are the same in all the districts. The plain purpose is not to take away any of the "jurisdiction" of the district judge then in the Northern district or to strip him, in any way, of equal participation in the powers of the court, but only to confer like powers upon the new judge. There is no provision, as in the act of 1886 under which Judge Toulmin was appointed, that the "present district judge" of the district shall thereafter be confined to another district, or be excluded from jurisdiction in either of the districts in which the prior law expressly confirmed him as judge. There is no word which, even by the most forced implication, raises the thought that the new judge shall be the "successor" of the old judge, or that cases in the hands of the old judge shall be transferred to the new judge, or that the old judge shall be excluded from his former jurisdiction, or any like provision. That the statute uses the words "a judge," and omits specifically to call him "additional judge," cannot be of the slightest significance, when the inevitable effect of the terms of the statute, which neither expressly affirm nor deny that he is an "additional judge," merely adds "a judge" to the judge already in the district, to hold the court therein. The nature of the duties and powers conferred upon "a judge," who is to exercise them in the district where there is another judge, determines whether he is an "additional judge," irrespective of the nomenclature adopted for the new judge, as plainly and as inevitably as if he had been called an "additional judge" in so many words.

After a somewhat diligent search of the various acts providing for a judge in a district in which there was already a judge, the writer has not been able to find a single statute where it has ever been held or thought to imply an intention to displace the old judge, unless it was so expressly stated or the intent was conveyed by the use of affirmative terms of some kind which necessarily implied the intent, as

in the act under which Judge Toulmin was appointed, that the old judge should thereafter be confined to other parts of the territorial jurisdiction, or that business pending before the old judge should be transferred to the new judge, or that the new judge should become the "successor" of the old judge in the district for which the new judge was appointed, and the like. If, however, the meaning of the language employed were doubtful, and we could look to surrounding circumstances, the result would be the same. The evil to be remedied was the inability of a single judge to promptly dispatch all the business in the Northern district, and the purpose was to cure the evil, not by taking any force then in the Northern judicial district out of it, but by adding to the judicial force already there. The purpose of the later legislation, to quote the language of Justice Story, was "merely auxiliary."

The writer at the time of the passage of the act of February 25, 1907, was as much the judge of the Northern as of the Middle district. He was no less the judge of the Northern district because he resided in the Middle district. He would have become no more the judge of the Northern district than he is, if he had changed his residence to the Northern district, as the law permits him to do. It would hardly be contended, if the plan suggested for the creation of a judge for both the Northern and Middle districts had been carried into effect by an act "to provide for a judge for the Northern and Middle districts" with provisions like those in the present act, that it would repeal the existing laws on the subject, abolish the judge already provided by law for those districts, and make the new judge the sole judge in both districts.

## Some Prior Occurrences.

5. There were occurrences, as to court officials before my colleague qualified, necessary to record here to give a proper understanding of the situation at that time. The writer having been appointed by a president who disregarded all partisan considerations in the appointment, and also because it was a high and proper standard of judicial conduct, ignored all partisan considerations in appointing court officials, retaining and reappointing those he found in office, two-thirds of whom were of opposite political faith, without regard to their respective attitudes in their internal party dissentions, and had carefully refrained from attempting to influence their conduct in such matters. Some of the chief political leaders here, assuming they had the moral right to have court officers appointed and removed to effect their political ends where a judge had been appointed by a president of the same political faith as their own, had shortly after my accession to the bench, suggested the removal of the clerks of both the districts for partisan reasons, and afterwards went so far in dictating appointments and removals to the marshals that the President issued a circular reprobating and forbidding the practice. It was known that immediately upon my colleague's accession to the bench some of these gentlemen, his trusted advisers, urged the removal of the clerk at Birmingham and the supplanting of the referees there, and the filling of their places with some of the gentlemen giving that advice. The Birmingham press more than once reported conferences to that end, and

more than once confidently named officials appointed by me, Mr. Birch. among them, who were stated to be objects of my colleague's disfavor, and with equal confidence gave the names of the persons, Mr. Steele among them, who would succeed them. Subsequent events proved the correctness of these prophecies. It was plain that the influential gentlemen who disapproved of my course in that regard and the attitude of individual court officers in their internal party strife, though they had been appointed on non-partisan grounds, and about two-thirds of them were of their political faith, were endeavoring to have that policy reversed, and to induce my colleague to take the matter in hand by entirely ignoring me in the appointment and removal of court officers. The writer could not consent to this plan, which, if carried out, would have made the court, so far as appointment and removal of its officials are concerned, a mere annex of a political organization.

Desirous of showing every official courtesy to my colleague, my purpose to aid him in every way in holding the courts was announced, and my view of the law, which gave us joint concern in the district, was also presented to him as soon after his appointment in April, 1907, as I had reason to think he was inclined to take a different view, together with the advice the writer had received and the several sources thereof. The writer, at the request of his colleague, gave him the authorities and the reasons which led to the conclusion that there were two district judges in the Northern district. He was most courteously informed of the policy the writer had pursued with reference to the appointment and removal of officers, and that, while the writer would not consent to the removal of any officer for other than legal cause, as to new appointments he most certainly would not ask anything which would not be cheerfully conceded to him, and that my view of our respective duties and functions was that neither could properly make an appointment or removal without the consent of the other, though either could hold court alone, and that the writer would not originate any order of the kind without his concurrence. His views and intentions were most courteously asked on these points, and it was most earnestly suggested, if difference arose, whether there were still two judges in the district, and as to their rights therein, that it be settled in a seemly way by a friendly test case.

In the correspondence which ensued, my colleague, while stating that his reported intentions, as given in the papers named, were the "idle gossip of newspaper scribblers" in papers which he had not read, and explicitly stating, "I have never said anything to anybody that I would make removals and appointments, or who I would appoint and when," yet, nevertheless, carefully refrained throughout the entire correspondence from committing himself in any way whatever as to his final intentions, either way, on these points, or even as to the course he would take as to a test case in event we disagreed, saying after the correspondence had continued for six weeks:

"I have not carefully considered all the questions contained in your numerous letters to me, for the pressure of public duties has been so arduous as to prevent my doing so. I respectfully decline to take up and decide these matters until such time as the public business will permit me to give proper consideration to the same."

The writer replied he had never had the slightest disposition to embarass his colleague by insisting upon a decision of any of these matters 'when his duties prevented him from giving proper attention to them, and concluded with this paragraph: .

"According you the same purpose not to mislead which I claim for myself in the use of language, I take it, when you say you cannot take up and decide these matters until such time as the public business will permit me (you) to give proper attention to the same, that you mean me to understand that you will advise me of your views after you have had the requisite opportunity to consider these matters."

During this time, however, my colleague had asked the writer to hold short terms in the Northern district, which, of course, he could not do without a designation if he were not a judge of the district, but ignored the suggestion when it was made to him to raise the question by an application to the circuit judges for my designation, and more than once referred lawyers to me for orders in cases in which the writer had made former orders, which, of course, would not have been proper if he thought the writer was not a judge of the Northern district. The writer was thus left in uncertainty as to his colleague's views or intentions, and the correspondence as it went along did not remove that uncertainty. Thus it was said in one of my letters to my colleague:

"The tone of your courteous letter of the 17th inst. in reply to mine of the 16th inst., which states my attitude as to matters in which we have joint responsibility and power, leaves me in doubt as to your position upon the points presented. I feel sure was not your intention, and upon being informed that the general language of your reply leaves me in uncertainty as to your position, you will unhesitatingly favor me with your views upon that point."

Again, in another letter of April 28, 1907, the writer said:

"There certainly can be no reason for declining to state your position. I would not intentionally be discourteous, or do you any injustice in these matters, but I must be frank to tell you that I do not comprehend what you mean."

After my colleague's letter that he would not take up and decide these matters until public business would permit, and my reply stating it was taken to avow he would inform me when he formed a conclusion, the matter was allowed to rest for about five months, until the writer felt it necessary to call the attention to the fact that the terms of the referees at Birmingham expired, respectively, on the 10th and 13th days of November. A letter, dated October 31, 1907, so advising him, was addressed to Huntsville, concluding with the suggestion:

"That we either allow the referees to remain as they are, or create a third one if you desire, whom I would join in appointing, or that you can name one of the referees and I the other, whom I would join in appointing. This, in my opinion, is the only way the appointment can be made. Please advise me what you will do. I will probably be in Birmingham on the 6th of November."

My letter of October 31, 1907, reached Huntsville in due course of mail on November 1st, and on that day, either before or after its receipt, my colleague made an order there to be entered at Birmingham, appointing Mr. Steele referee, though the order was not mailed for filing until two or three days later. The appointment was doubtless timed to anticipate my coming, for undoubtedly my colleague was then

possessed of his present views that my absence from the district justified what might not otherwise be valid. No word preceding it had come to me from him, though the correspondence had been halted awaiting it. My colleague had committed himself to advising me of his intentions as soon as his labors would permit him to form his conclusion. My coming to Birmingham was fixed by the date of a social event which the court officers, Mr. Steele among them, knew the writer would attend. He well knew, and besides it was chronicled in the local press, that the writer was recalled from Birmingham by the sudden death of a brother on the morning of November 6, 1907. When the writer fixed and announced the date of his visit to Birmingham, he could not have foreseen that Steele would be appointed five days in advance of that date. The writer's motive in going to or returning from Birmingham had no bearing whatever upon the legality of the order removing him. Yet, in the face of the known facts, the petition of Steele affirms, under all the solemnity of an oath, that the writer came into the district for "the sole and only purpose of making the order" removing him, and seeks to convey the impression that the writer's return was due to the fact that he had made the order. Evidently this sacrifice of the facts was made to furnish the text, seized upon in the opinion, to comment upon the "only visit" of the writer to the district, etc.

Stranger still, my colleague, who had been advised of the date of my coming, at a time when he knew the writer could not know that Steele had been appointed, for he had not then been appointed, and at a time when he knew the writer, relying on the sincerity of the correspondence between them, did not anticipate any appointment prior to the date of that visit, nevertheless deliberately reiterates, in a judicial opinion, that the visit was "for the sole purpose of removing petitioner from his position as referee," and indulges, also, in the vague insinuation, which cannot be fitly met, much less discussed in a judicial opinion, that the writer "could with equal impunity" have remained at home.

Being in Birmingham on November 5th, the writer promptly opened court and revoked the order appointing Steele, having no doubt that one judge had as much right to revoke the appointment as the other had to make it without the consent of his colleague. The reply to my letter of October 31st, which was not received until my return home on November 6th, was written after my colleague had acted, but did not advise me of his action, and stated his position as to a friendly test case, only in the general and uncertain terms, which governed the correspondence before.

Shortly afterwards bills (it is not necessary to inquire where they were originally framed) were introduced in both houses of Congress to make my colleague "supreme," by legislating me out of the Northern district. The purpose was now apparent, by means of orders constantly revoking mine, to keep Mr. Steele in office without my consent, and by the same means to exclude any appointee I might name meanwhile, until the bill could be passed. If the bill should pass, nothing practical would be gained by further orders by me, and the writer was not desirous of laurels won in a race of conflicting orders with a brother judge over the appointment of officers. The writer therefore allow-

ed the matter to rest until the adjournment of Congress, and as soon as it was known that Congress had adjourned on May 30th, without any action of these bills, the writer made an order appointing as one of the referees at Birmingham Mr. Alex. C. Birch, a gentleman of high character, who had served acceptably before and was overwhelmingly indorsed by the bar for reappointment. While Mr. Steele was not the writer's choice he was willing for his colleague to have his way in the choice of one of the referees, though the person might be "hostile" or "offensive," if my colleague yielded the same consideration to me. The writer therefore withheld any further order as to Mr. Steele in abeyance, awaiting further developments.

The order appointing Mr. Birch was made in chambers in the Middle district on Saturday, May 30, 1908, after it was known Congress had adjourned, and immediately mailed to the district clerk at Birmingham to be entered on the minutes there. The appointment had been delayed until that time for the reason already stated. When it was made the writer was the sole judge of the Northern district, and thus relieved of the situation in which he could not originate an appointment without the consent of a colleague, a view of the matter by which he had announced he would be governed if his colleague respected it. The writer did not doubt that the order of May 30th constituted a valid appointment by a sole judge. He repeated the order on June 1, 1908, in open court at Birmingham, regardless of his colleague's claim of "supreme power," if he had then qualified under a new appointment, because the issue could not be permitted to remain unsettled, and the personal presence in court of the judge who repeated that order would eliminate any collateral issue in the appellate court, if my colleague were reappointed and revoked the order, neither of which the writer doubted. Had the writer desired to avail himself of "supreme" power, in the situation of his colleague on the 30th of May, he would have removed Steele, who was illegally appointed without his consent. Wishing, however, to enforce and make effective only equal authority in the future, the writer, though then sole judge, made no order as to Mr. Steele, but contented himself with the appointment of Mr. Birch as a referee.

### Ex parte Steele.

7. It must be said, with all due respect to my learned colleague, that his two opinions in Ex parte Steele are hopelessly irreconcilable. If as he asserts, his first opinion is "the law of the district," it is a flat-footed authority against his right to order the removal of Mr. Birch, who was appointed by me under the identical circumstances under which Mr. Steele was appointed by my colleague. Irrespective of that, the grounds upon which each of those opinions are rested are clearly untenable. These will now be considered. The issue here is not in the slightest degree as to one "court of concurrent jurisdiction" setting aside the decree or orders of "another court of competent jurisdiction." The issue is what judges, who exercise a joint power in appointments, constitute the very court which makes the orders. The order here concerns a mere administrative matter, the appointment or removal of a court officer, whose tenure is dependent upon the "dis-

cretion" of the court. The difference between such an order and a judgment or decree rendered in suits or proceedings among adversary parties is strikingly great. Decrees or orders in adversary litigation must be based upon some proceeding initiated to settle some disputed matter of right between contending parties. There must be a plaintiff and a defendant. Each has a right to notice of the various steps in the proceedings, to offer evidence and be heard, and then to appeal from the order or decree, which is final in general, unless reversed on appeal or writ of error. An order appointing or removing a referee has none of the elements of a decree in equity or a judgment at law. The appointment may be made or revoked at any time, at the "discretion" of the authority which makes it. An appointee with such a tenure is not entitled to notice or to be heard before the order of removal is made, or to appeal from it, or to revise it in any way, unless the re-removal is attempted in an illegal way, or by a tribunal not authorized to make it. All else rests in the "discretion" of the appointing power. There is no plaintiff or defendant, and no legal right in dispute, for the appointee has no right to hold against the will of the appointing power. There is no need for any proceeding or notice. The appointing power acts ex mero motu in whatever mode it chooses, as in its opinion the circumstances of the particular case require. The power to appoint and remove a court officer is not in its nature judicial or governed by the rules ordinarily applicable to the exercise of judicial power. It is in its nature executive or administrative, and under the Constitution Congress could have confided the power to the Executive Department and denied it to the courts.

The removal of Mr. Steele, whose appointment lacked legality because made by one judge, without the consent of the other, could not be illegal, as held in Ex parte Steele, because no "proceeding" was pending to that end, or because he did not have notice or a hearing. Ex parte Hennen, 13 Pet. 230, 10 L. Ed. 138; Field v. Com. 32 Pa. 478; People v. Mayor, 82 N. Y. 491; State v. Register, 59 Md. 283.

The failure to draw the distinction between the nature of the act when the officer is appointed or removed, and when decrees in equity or judgments at law are rendered, results in the further fallacy that conceding joint power to the judges in administrative matters like the appointment of officers, "would block the wheels of justice" in the trial of adversary litigation, in which judges have no joint power, "whenever one of the judges of the court is absent or sick."

Another curious fallacy asserted in both the opinions is that as there is but one district court in the Northern district, and that court is made the court of bankruptcy within its territorial limits, it would be a "migratory court" if one of the judges held the court of bankruptcy and made orders therein at one place, while another judge is holding court and making orders at the same time in another place, in the same district. That was the case when my orders were made in open court removing Mr. Steele and appointing Mr. Birch. If judges holding court at the same time in different parts of the district makes the court migratory, it has always been such, and the law so intended. There are four specified places in the Northern district for

holding open court. For more than a score of years the law has provided for the designation of an outside judge to hold court in the district when there is an "accumulation of business," and that has been frequently done, and they undoubtedly can exercise all of the powers of the regular judges therein. The statutes also frequently provide for two judges for the same district. Is it possible that the writer, one of the regular judges, could not hold the court of bankruptcy at Birmingham while his colleague, another of the regular judges, was holding court at Huntsville? Is it possible that Judge Toulmin, who, for a long time was designated to hold court in the Northern district, when holding court at Anniston. while the writer, who is the regular judge, was holding court at Birmingham, could make no legal orders in bankruptcy, or legally hold the bankruptcy court? Certainly the statute designated the writer as one of the judges of the Northern district, and he did not require any commission or permission from his colleague to hold court at any place in the district whenever he saw fit. It is needless to say that, where the court consists of more than one judge, each judge may hold the court in any part of the territory, and can exercise all the powers of the court in matters before him, although another judge is sitting at the same place or at a different place in the same territorial jurisdiction. The city court of Birmingham is a familiar instance of different judges holding the same court in the same place, and each exercising all the powers of the courts in cases before them. This is also true of the Circuit Courts of the United States, each of whose judges may hold court at the same time, in the same place, or at different places in the same district, and as to matters before him exercises all the powers of the court. His conclusion is rested upon the argument that, in prescribing the judge's duties as to adjudication, reference and dismissal of petitions, etc., the bankruptcy statute says "the judge" shall do these things. Clearly, he says:

"If it were intended that there should be more than one judge of the court of bankruptcy, reference would have been made to any of the judges, or the judges, rather than the judge. Or if it were the intention of Congress to confer jurisdiction in certain cases upon more than one judge, the statute would have read the judge or judges."

If this be a correct interpretation, there would be no way to determine what judge should discharge these duties in a district, where, as is frequently the case, there is more than one regular judge in a district. The very letter of the bankruptcy statute shatters the argument of my learned colleague and removes all possible doubt, if otherwise there could be any. It expressly declares, in subdivisions 29 and 30, section 1 (Act July 1, 1898, c. 541, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3420]), that:

"Words importing the plural number may be applied to, and mean only a single person, or thing, and words importing the singular number may be applied to and mean several persons or things."

The learned judge, strange to say, also ignored subdivision 16 of the same section, which declares that "judge" shall mean "a judge of the bankrupt court." Most plainly therefore, even under the

letter of the bankruptcy law, the words "the judge" mean "a judge of the court of bankruptcy." How can it be seriously contended, when the bankruptcy law confers jurisdiction in bankruptcy upon the District Court, that it intended to exclude any of its judges from the performance of any of the duties assigned to the court in that regard?

It is said of the order appointing the referees at Anniston and Talladega:

"Although it has been some weeks since these appointments were made, yet so far they remain unchallenged."

Did the learned judge have any reason to think such challenge might come? Mr. McCarty had been unanimously recommended by the bar at Anniston for reappointment. My colleague knew the writer earnestly desired his reappointment, and would have made the order, but did not think he should originate it without Judge Hundley's consent, and Mr. McCarty's friends had therefore been directed to apply to him. A member of the Montgomery bar visited my colleague about the appointment of the referee at Talladega, and was authorized to state, and did state, as he informs me, that while Mr. McMillan would be very satisfactory to me, yet, as it was one of the first appointments since my colleague's accession to the bench, the writer would defer to his wishes, and he might select the other candidate in whose interest this member of the bar visited him, if he so desired.

It is also said in that opinion, Mr. Steele's appointment was made "without reference or regard to any other referee in bankruptcy and was made because the business of the court demanded the appointment." The terms of both the other referees expired within two weeks after Mr. Steele's appointment. When it was made, my colleague had rejected an offer to reappoint them, and to put in a third referee of his selection, or for each of us to appoint one referee, and knew they would go out, and since the writer had stated that without his consent he would not originate an appointment. There had been no sudden shrinkage of the business, and the experience of the past four years showed that it required at least two referees to dispatch it. Mr. Steele was thereafter continued as the sole referee, and the effort to appoint another referee has been stoutly resisted. Under such circumstances, how can it possibly be sincerely affirmed that the appointment was made "without regard to any other referee?"

## What Helped to Keep Down the Dockets.

Both opinions in Ex parte Steele emphasize the fact that the writer has held no regular court in the Northern district, not even "tried a single case," since the appointment of his colleague. These reasons were well known, though deliberately ignored. These opinions emphasize the self-sacrificing labors of my colleague, and the improvement thereby effected in the condition of the dockets as compared with former conditions. In the last opinion it is said, although he "found the dockets of every division of my district greatly crowded, save in the Southern division," he had, "by persistent work

caught up with the business in all its branches." The opinions abound with such expressions as these:

"Almost continuously on the bench." "Found the dockets of every division in my district greatly crowded." "By persistent work succeeded in catching up with the business." "Found every docket of this district greatly congested with undetermined cases." "Day and night my time has been given unsparingly to litigants." "There are now so many pressing cases on my desk needing attention."

But what have these things to do with the law of the case? It is not possible that my colleague supposed the facts he thus emphasizes could affect in the slightest degree the legality of the act under discussion. The opinion dwells upon them for some other purpose. The constant iteration by my colleague regarding the improvement in the docket by his strenuous labors, as compared with former conditions, could have no other purpose than to suggest comparison as to the efficiency of the service or devotion to duty of judges who labored in that field before him. If it be proper, in any event, for a judge to invite such contrast, it is not improper for another judge, when such contrast has been repeatedly drawn, to remark that in the Southern division (Birmingham), where the business has not been "caught up with," the bulk of the litigated cases in the past arose from removed suits against foreign corporations. For more than a year past these foreign corporations, awaiting decisions in the appellate court as to the constitutionality of the statute which forfeits their right to do intrastate business, if they remove a case to the federal courts, have, save in one solitary case, carefully refrained from removing any case to the federal court at Birmingham or elsewhere in the Northern district. It is apparent this taking away of the chief source of the courts litigated business has kept down the number of cases on the docket at Birmingham, and elsewhere in the district, as compared with former conditions, as much as the devotion to it of one judge's entire time would have done under former conditions.

What Temporarily Kept One of Its Judges out of Northern District.

It is well known to every one in Alabama that when my colleague was appointed in April, 1907, the writer was then in the Middle district busy with many phases of the fiercely contested railroad rate litigation which occupied all his time until late in September, and that upon his return to the Middle district, after a very short vacation, his time was again constantly taken up by renewed phases of litigation in that matter growing out of legislation at the extra session of the Legislature, and that he could not possibly have gone to his colleague's assistance. Moreover, his colleague, upon his qualification, without consulting the writer in any way, set the docket at each term in the several places in the Northern district, because he desired to dispatch its business alone. It would have been improper, not to say unchivalrous, for the writer, under those circumstances, to have gone of his own motion into the district and held court in the intervals, if he had the spare time, and thereby deprived his colleague of the opportunity to gain all the reputation possible in handling the entire dockets in the Northern district, pending a contested confirmation.

It is known to every one at all familiar with the litigation in the Northern district that one judge cannot keep down its dockets. My colleague must have assistance. The law put the duty to give that assistance upon the writer, as far as he can with regard to duties in another district. It was as well known to my colleague, as to members of the bar, that, upon the ending of the abnormal pressure put upon the court in the Middle district by the railroad rate litigation, the judge of the Northern and Middle districts must, and again will, resume the holding of court in the Northern district, as he did for years prior to his colleague's appointment. The judge of the Northern and Middle districts has served in the Northern district for years. Its bar and people, with whom he had long been identified in many ways, welcomed his appointment, and when it became known that he suggested a change in his relations to the district protested, and continue to protest, against it.

A judge of the court, occupying such relations to its bar and people, responsible in part for the character and conduct of its officials, and having to come in contact with them, surely has both moral and legal rights there, and it is difficult to fathom the frame of mind which induces a judge recently appointed for the district, who, the writer with proper diffidence can fairly state, has no foundation upon which to claim any superiority, to ask, much less to demand, that he be allowed to do as he pleases in the district. My colleague, however, suffers himself to say:

"If the learned judge can leave his district and court, and come into my district, as may suit his purposes and desires, and change without my knowledge or consent orders and rules in bankruptcy made by me, then the public business will be seriously disturbed."

Is the Northern district "his district," or "my district," or the personal or peculiar property of either of the judges? Is not the disturbance of the public business, if there has been any, caused by the junior judge's setting aside, without the consent of the older judge, the former arrangement, and refusing to enter into any arrangement whatever?

### Not Seeking to Enforce His Own Will at All Hazards.

That there has been no "serious" disturbance of the bankruptcy business is due solely to the fact that the writer, out of regard for the judicial office, and mindful of the interests of the public, after he had been disappointed in making a test case, declined to attempt to enforce his own will, at all hazards, by continuing to revoke the orders appointing Steele, as my colleague has done, and avows a purpose to do, regarding any order of appointment made by me of another referee. The writer permitted his colleague's order overriding the order annulling Steele's appointment to stand until some further order was made in his case, though by such a course a colleague was allowed by sheer usurpation, in the most offensive form, to continue Steele in office against the writer's will, and by the same methods to keep out of office any one appointed by the writer.

The law was not, as my colleague mistakenly believes, the "beacon light" which guided his "footsteps." The will o' the wisp which guided

them was the fancy that the Northern district is "my district," and that "due respect to the office I hold" justified the refusal of a test case, and any regard whatever to the rights of a brother judge, "at least when he is without the district." The older judge made no claim to superior authority, offered his colleague all he asked for himself, and after months' delay, in which his colleague makes no "footsteps" whose imprint discloses his final intentions, finds that colleague denying the writer's authority, trampling upon his rights, and preventing, as far as he can, any determination of the issue in a court of review. When the older judge, as he must, unless there be abject submission, makes orders to test these strange pretensions, his presence is described, in effect, as a visit without the permission of a colleague, and his orders are treated in a judicial opinion as in the nature of an invasion of another judge's territory and a raid upon the orderly transaction of business conducted by the other judge. The facts make their own comment, and show whether there has been self-seeking disregard of the legal rights of a brother judge, or a want of the courtesy usually obtaining among judges, or trespassing in any way upon what one judge owes another, and by whom. None of these things, as before remarked, enter into the legal merits of the case. They are brought forward by my colleague to draw some moral, and the writer is content that it be drawn.

## Authority of Judge of Northern and Middle Districts, While in One of Them, to Make Orders to be Entered in the Other District.

My order removing Steele and one order appointing Birch were made while in open court in the Northern district. The other order appointing Mr. Birch was made in the Middle district. Any discussion of the power of a judge when out of the district can bear only upon the latter order. No one claims that a judge can make any order out of court, unless the power be given expressly or by necessary implication by statute, immemorial usage, or by the rules of the court. Here, as we shall presently see, all these sources of the power are found.

The appointment of an officer is quite unlike any order which affects the rights or interests of adversary parties in court. Anything which shows that the persons who compose the court have made the appointment is sufficient. Though it is a far better practice, no formal entry of the appointment upon the minutes is necessary. As said in Ex parte Hennen, 13 Pet. 229, 10 L. Ed. 138:

"The law giving the District Courts the power of appointing their own clerks does not prescribe any mode in which it shall be done."

In that case, the sole judge of the court in which the power was vested "executed and delivered a commission" to a person, who entered upon his duties and was recognized as clerk by the court. On direct attack it was held that it was "amply sufficient" to show that the court had appointed such person. Even judges of a common-law court can lawfully make an order of appointment in vacation, to fill a court office, since it is an undoubted duty of a court to whom the

appointment and removal of officers is confided to see, in the interest of the public, that the office be filled at all times.

If an order be otherwise valid; there are numbers of matters regarding the preparation of cases, preservation of property, appointment of officers, adjustment of their relations and duties, and other matters of administrative detail, as to which orders may be entered in courts in equity (and the bankrupt court is certainly such) when the judge who makes them is miles away, if he is then at a place where he is authorized to perform judicial functions. Central Trust Company v. Sheffield, etc., R. R. Co. (C. C.) 60 Fed. 9; 2 Daniel, Chancery Pleading & Practice, p. 1264, § 1324.

These orders, as we all know, are commonly called "chambers orders." Chamber business, as said in Re Neagle (C. C.) 39 Fed. 855, 5 L. R. A. 78, may be done, and is often done, on the streets, in the judge's own house, at the hotel where he stops, or it may be in transitu, on the cars. When that case went to the Supreme Court (135 U. S. 55, 10 Sup. Ct. 658, 34 L. Ed. 55), it is said:

"This chamber work is as important and necessary, and as much a discharge of his official duties, as though performed in the courthouse. Important cases are often argued before the judge at any place convenient to the parties concerned, and the decision of the judge is arrived at by investigation made in his own room, wherever he may be, and it is idle to say that this is not as much a performance of judicial duty as the filing of a judgment with the clerk, and the announcement of the result in open court."

The court of bankruptcy, save in matters where a jury is required, is in the strictest sense a court of equity. It is always open. It has no terms. Under general order No. 37 (89 Fed. xiv, 32 C. C. A. xiv), the rules of equity practice prescribed by the Supreme Court "must be followed as near as may be." If a judge need not be in open court to enter an order appointing an officer, and the order can be made at one place and sent for entry in court at another place, as was the case in Steele's appointment, which was made at Huntsville, and entered at Birmingham, my order in chambers at Montgomery, appointing Mr. Birch and forwarded for entry in Birmingham, cannot be invalid because the writer was not personally present in the court at Birmingham. Can it be invalid because the writer was not then personally present in the Northern district?

The original statute (codified section 552 of the Revised Statutes [U. S. Comp. St. 1901, p. 447]) provides:

"There shall be appointed in each of the states of Alabama * * * one district judge, who shall be district judge, for each of districts included in the state."

The act of August 2, 1886, declares the "jurisdiction" of the successor of that judge shall thereafter conclude only the Northern and Middle districts. "Jurisdiction" as to what? As "judge of each of the districts." The construction contended for by my colleague would require the interpolation of a proviso that the judge is not to be "judge of each district" at the same time, as to any matter whatever.

The writer is made by statute equally the judge of the Northern and Middle districts. He is required to reside in one or the other of these districts, and may exercise his choice. For what purpose

is this residence in one or the other of the two districts required? It is exacted so that whenever in either the judge may discharge therein judicial functions concerning both districts, at any time and place in either, where the nature of the act does not require his personal presence in a court at a particular place in one of the districts. The law intended to give both districts the same service in this respect as if they constituted one district under one judge. Ex parte Parker, 131 U. S. 225, 9 Sup. Ct. 708, 33 L. Ed. 123; Horn v. Pere Marquette R. Co. (C. C.) 151 Fed. 641.

A judge of the Northern district while holding court at Huntsville may make orders to be entered in court at Birmingham, because he is then in the territorial limits in which he is authorized to perform judicial duties. The judge of the Northern district may not make orders to be entered in the courts there when outside the territorial limits of the Northern district, because when out of its limits he is not at a place where the law authorizes him to perform judicial functions. The judge of the Northern and Middle districts may make orders to be entered in the courts in the Northern district, though not then in the Northern district, provided he is then in the Middle District, since there, as well as in the Northern district, he is within the territorial limits where the law authorizes him to exercise judicial functions regarding matters in the Northern district.

To hold otherwise would be to hold that the judge of the Northern and Middle districts is, in no sense, a judge of the Northern district, so long as he is not in that district, although he is in the Middle district, and to hold the same thing as to the Middle district when he is absent from it, though in the Northern district; or, in other words, that when the same person is judge equally of two districts he can never act as judge of both at the same time. Is it possible that the judge of the Northern and Middle districts while at Birmingham can make no valid order directing the marshal of the Middle district to attend him at one of the places in the Middle district, where he intends to open court? Is it possible that the clerk of the Middle district could excuse disobedience of an order to attend upon the court, or to draw a jury, or to enter any other proper order, on the ground that it had no legal validity, because the judge was not in the Middle district when he made the order and did not afterwards personally come into the district to enter it? What is true as to one district in this respect must hold good as to the other. If it be held that a judge who is equally judge of both districts has no such power, we impute to Congress a design to suspend the execution of all the statutes of the United States, so far as that judge's services are requisite in the Middle district, whenever the judge goes into the Northern district to perform duties there, and vice versa.

A case on all fours in principle with this is Hayzlett v. McMillan, 11 W. Va. 464–479. There the judge had authority to dissolve an injunction in vacation. He was judge of a circuit consisting of several counties, each constituting a separate circuit court, of which he was judge. Admitting his power to dissolve the injunction in vacation if he had gone into the particular county in which the matter was pending, it was stoutly denied that he could make the order when

in another county; but the contention was promptly overruled. The Supreme Court of that state said:

"The judges of the respective judicial circuits, each composed of the several counties by the Constitution and the law, are absent or may be absent from each county of their circuit a large portion of each year, holding the term of the circuit court required to be held in each county of their circuit. While they are holding a term of the court in each county, there is a vacation of the circuit court of each of the other counties composing the circuit, and if the judge of the circuit court in which a case is pending, wherein an injunction is awarded, could only hear a motion to dissolve an injunction within the county, in which such case is pending, then during the greater part of each year a motion to dissolve an injunction could not be heard and the plain object of the law would be defeated."

It was further said:

"To construe the powers of the circuit judge so as to forbid him to act in another county in his circuit in a case pending in a county from which he was absent would be plainly a departure from the purpose and object of the law, and render the power almost useless."

It is only of late years that there has been more than one judge in most states. Most of the states have always been divided into more than one district. After a most diligent search of the federal reports, no case can be found where the same person was judge of more than one district, where it has ever been held that a chamber order, otherwise lawful, was invalid, because the judge, at the time he made it, was not in the district where it was to be entered, if he was at the time it was made in some one of his districts. Certainly, if the power had been disputed, some case would have been made and decided in all these years as to the power. The exercise of such power is so essential to the object for which judges and courts are created that it is almost inconceivable, in the absence of any case challenging their authority, that the judges in the past acted on any other view.

The invariable practice of my predecessors under the bankruptcy laws of both 1867 and 1898 was, while in one district, to make all necessary orders, if need be in invitum, in bankruptcy, to be entered in another district, save in matters where a jury was required. For the past seven years it has been the practice of the writer, while in one district, to hear and decide bankruptcy cases, pending in the other district, if they were pressing, except where a jury was requisite, and to cause the proper orders to be entered in the proper district, though not personally present therein. There was never a hint that the procedure was illegal. In the noted Southern Car & Foundry Company Case, in which very eminent lawyers from several states appeared, and the administration of the large estate of the bankrupt pending in the Northern district was removed to the District Court in Tennessee, the parties afterwards sought to review the order on other grounds of jurisdiction, but not that jurisdiction was wanting, because the order was actually made in the Middle district, without consent of the interested parties. This long usage, extending through a series of years, followed by all the judges of the court during that period, is the legal equivalent of a positive rule of court on the subject. "It is not essential that any court, in

establishing, or changing its practice, should do so by the adoption of written rules. Its practice may be established by a uniform mode of proceeding, for a series of years, and this forms the law of the court." Duncan v. United States, 7 Pet. 435, 8 L. Ed. 739.

The writer has not been able to ascertain from the records accessible what the practice was under the bankruptcy law of 1841; but it is hardly probable, with the costly and difficult means of communication between the districts in those days, that "the judge of the several districts" practically suspended the bankrupt law in any of the districts, on the theory that he could not lawfully make any order in a district unless personally present in that district. This long contemporaneous construction by the courts supplies the immemorial usage which is a frequent source of power in the courts and relieves the question of any difficulty, if the effect of the statute as to the power of a district judge of the several districts in this particular could be matter of doubt. A construction of the law, relating to the power of the judge of the Northern and Middle districts, and his early predecessors who were judges of all the districts, which forbids a judge while in one district to exercise judicial functions in matters concerning the other, would nullify every order in past years granting or denying a discharge in bankruptcy, or for the conservation or sale of a bankrupt's estate, or decision as to a claim or composition, or for an injunction or receiver, if actually made in another district, though entered in the district where the bankrupt's estate was being administered, unless the order or decree was entered by consent, or the judge, after signing the order, went personally into that district and ordered its entry there.

### Duty of Judges to Set an Example of Order.

9. The situation, in short, is this: If there be two judges of the Northern district, as the writer does not doubt, the appointment of Referee Birch on the 30th day of May, 1908, is valid, because the order was made by the then sole judge of the Northern district, and the reappointment of my colleague, again making two judges in the district, would not authorize him alone to revoke it. Apart from this, the appointment of Referee Birch made in open court June 1st is valid without the consent of Judge Hundley, if his appointment of Referee Steele be valid without my consent. If neither of these propositions be true, then there is no legal referee at Birmingham. A judge of the Northern district insists that the judge of the Northern and Middle districts has no rights which he is bound to respect, "at least when absent from the district." That view, if one may properly use such a simile of a judicial situation, compels one of the judges to "sit upon the lid" all the time to preserve his rights. This he cannot do, having duties in another district. Unless there be submission, which is not to be thought of, to the claim of "supreme" power on the part of a colleague, the judge of the Northern and Middle districts, whose authority is thus usurped, must, from time to time, make and enforce orders to preserve his authority. Must the clerk and marshall and the referees be beset with contradictory orders from judges of the same court, and punished for contempt for

162 F.—46

disobedience by one judge, or released on habeas corpus by the other judge? Against being driven to such a necessity by the refusal of a test case, the writer earnestly protested, particularly in a letter of May 21, 1907, in which it was said:

"The public uncertainty and inconvenience growing out of such a state of affairs would be deplorable. The subordinate officers of the court would be between two fires, and forced at their peril to settle a judicial question, which would thus be thrust upon them. They would be liable to imprisonment if they disobeyed an order. One judge might put them in prison, and another take them out. No man, I think, who is not an enemy of both of us, would desire such a state of things. * * * The only way to avert these evils is to raise the question of our authority in some actual case, in such mode as will get a speedy judicial decision, and thus avoid embarrassment to us and injury to the public, and upon that I hope there may be agreement between us."

Still impressed with these views, and that it is the duty of judges to set an example of order, in official acts, and determined for the sake of the court to first exhaust every available alternative, before taking extraordinary steps even in resistance to bald usurpation, the writer has advised Referee Birch to seek to review in the Circuit Court of Appeals Judge Hundley's order revoking his appointment and vacating my order as to the disposition of cases, under section 24 of the bankruptcy statute, and, having been advised that such petition has been filed, directs the clerk to file this opinion in the last case of Ex parte Steele, wherein the orders of May 30 and June 1, 1908, in reference to Referee Birch were revoked.

It would seem that there is both warrant and need for the exercise of power to "superintend and revise in matters of law" the "proceedings of the several courts of bankruptcy," when different judges of the same court of bankruptcy confuse litigants, attorneys, and court officers by constant orders revoking the appointment of referees, and give conflicting directions even as to the reference of cases in bankruptcy, without which the bankruptcy law cannot be executed in any case, casting doubts on the validity of the acts of referees, and impairing confidence in the court itself, when such steps in the administration of justice therein are taken by the judges. In re Seebold, 105 Fed. 913, 45 C. C. A. 117, which is cited approvingly by the Supreme Court in Plymouth Cordage Co. v. Smith, 194 U. S. 311–315, 24 Sup. Ct. 725, 48 L. Ed. 992; Loveland on Bankruptcy, § 313, p. 900 et seq.; In re Carley, 117 Fed. 130, 55 C. C. A. 146.

For the foregoing reasons, no further order will be made by me in this matter, pending the decision of the Court of Appeals.