## FROST *v.* WENIE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 172. Argued January 24, 1895. — Decided March 4, 1895.

Where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, and no purpose to repeal the earlier act is expressed or clearly indicated, the court will, if possible, give effect to both.

In view of the treaties between the United States and the Osage Indians, and the laws affecting their lands enacted prior to December 15, 1880, it must be *held* that the lands which were, by the act of that date, 21 Stat. 311, directed to be opened for entry under the homestead laws, were lands within the abandoned Fort Dodge military reservation, subject to disposition under general laws relating to " other public lands,".and not lands of an exceptional class, that were affected with a trust established for the benefit of Indians by treaty.

THE appellant, who was the plaintiff below, claimed to be possessed of the equitable title to certain lands, the legal title to which is in the appellee, Frederick T. M. Wenie, by virtue of a patent issued by the United States January 25, 1890.

The relief sought by the bill is a decree declaring the legal title to be held in trust for the plaintiff, and requiring the defendant to convey such title to him.

The lands in dispute constitute a part of what are known as the Osage Indian trust and diminished reserve lands in Kansas, included within what was once the Fort Dodge military reservation, established June 22, 1868. They are lots 9, 10, 11, and 12 in section 25, township 26 south, of range 25 west, and lots 14 and 15 of section 30, township 26 south, range 25 west, in Ford County, Kansas.

The appellant made a homestead entry of these lands on the 1st day of October, 1881, at the Larned, Kansas, land office. This entry was made under the assumption that the lands had been restored to the public domain by the act of Congress approved December 15, 1880, c. 1, which declared that the Fort Dodge military reservation was no longer needed for military purposes, and authorized the Secretary of the Interior to dispose of a part of the lands within that reservation to actual settlers under the provisions of the homestead law. 21 Stat. 311.

The case turns on the construction of that act — the controlling question being whether Congress intended to open to actual settlers under the homestead laws such of the lands, within the limits of the abandoned military reservation, lying north of the railroad track, as were part of the Osage trust lands. The court below held that it did not.

The principal ground of the decision was that a different interpretation is not required by the terms of the statute, and would be inconsistent with the treaties between the United States and the Osage Indians and with the previously declared purpose of Congress in reference to the Osage lands.

Before looking at the language of the act of December 15, 1880, it will be well to recall the history of these lands, as well as the relations between the United States and the Osage Indians, as shown by treaties and by legislative enactments.

One of the articles of the treaty of June 2, 1825, between the United States and the Great and Little Osage tribes of Indians, established a reservation in what is now the southern

part of Kansas, which those Indians could occupy as long as they chose to do so.    7 Stat. 240.

By an act, approved January 9, 1837, c. 1, it was provided: "SEC. 1. All moneys received from the sales of lands, that have been, or may be hereafter, ceded to the United States by Indian tribes, by treaties providing for the investment or payment to the Indians, parties thereto, of the proceeds of the lands ceded by them, respectively, after deducting the expenses of survey and sale, any sums stipulated to be advanced, and the expenses of fulfilling any engagements contained therein, shall be paid into the Treasury of the United States in the same manner that moneys received from the sales of public lands are paid into the Treasury. SEC. 2. All sums that are or may be required to be paid, and all moneys that are or may be required to be invested by said treaties, are hereby appropriated in conformity to them, and shall be drawn from the Treasury as other public moneys are drawn therefrom, under such instructions as may from time to time be given by the President."    5 Stat. 135.

In the act of July 22, 1854, c. 103, establishing the offices of surveyor general of New Mexico, Kansas, and Nebraska, is a provision "that all the lands to which the Indian title has been or shall be extinguished within said Territories of Nebraska and Kansas shall be subject to the operations of the preëmption act of fourth September, eighteen hundred and forty-one, and under the conditions, restrictions, and stipulations therein mentioned."    10 Stat. 308, 310.

By the act of May 20, 1862, c. 75, the object of which was to secure homesteads to actual settlers on the public domain, it was provided, among other things, that all lands subject to preëmption entry might be acquired by homesteaders without the payment of cash therefor.    12 Stat. 392.

And by the act of June 2, 1862, establishing a land office in the Territory of Colorado and for other purposes, it was declared "that all the lands belonging to the United States to which the Indian title has been or shall be extinguished shall be subject to the operation of the preëmption act of the fourth of September, eighteen hundred and forty-one, and

under the conditions, restrictions, and stipulations therein mentioned." 12 Stat. 413.

On the 26th day of September, 1865, another treaty was made between the United States and the Great and Little Osage Indians. It was amended in 1866, and proclaimed January 21, 1867. By its first article the Indians granted and sold to the United States the lands within the following boundary: "Beginning at the southeast corner of their present reservation, and running thence north with the eastern boundary thereof fifty miles to the northeast corner; thence west with the northern line thirty miles; thence south fifty miles, to the southern boundary of said reservation; and thence east with said southern boundary to the place of beginning: *Provided,* That the western boundary of said land herein ceded shall not extend further westward than upon a line commencing at a point on the southern boundary of said Osage country one mile east of the place where the Verdigris River crosses the southern boundary of the State of Kansas." The consideration for this sale was the agreement of the United States "to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians in the Treasury of the United States, and interest thereon at the rate of five per centum per annum shall be paid to said tribes semi-annually, in money, clothing, provisions, or such articles of utility as the Secretary of the Interior may from time to time direct." By the same article of the treaty it was provided that "said land shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws, including any act granting lands to the State of Kansas in aid of the construction of a railroad through said lands, but no preëmption claim or homestead settlement shall be recognized : and after reimbursing the United States the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, the remaining proceeds of sales shall be placed in the Treasury of the United States to the credit of the 'civilization fund,' to be used, under the

direction of the Secretary of the Interior, for the education and civilization of Indian tribes residing within the limits of the United States." 14 Stat. 687, 692.

The Indians by the second article of this treaty ceded to the United States other lands, constituting a tract of twenty miles in width from north to south, off the north side of the remainder "of their previous reservation," extending its entire length from east to west. As to this cession it is provided: "Which land is to be held *in trust* for said Indians, and to be surveyed and sold for their benefit *under the direction of the Commissioner of the General Land Office, at a price not less than one dollar and twenty-five cents per acre as other lands are surveyed and sold, under such rules and regulations as the Secretary of the Interior shall from time to time prescribe.* The proceeds of such sales, as they accrue, after deducting all expenses incident to the proper execution of the trust, shall be placed in the Treasury of the United States to the credit of the said tribe of Indians; and the interest thereon, at the rate of five per centum per annum, shall be expended annually for building houses, purchasing agricultural implements and stock animals, and for the employment of a physican and mechanics, and for providing such other necessary aid as will enable said Indians to commence agricultural pursuits under favorable circumstances: *Provided,* That twenty-five per centum of the net proceeds arising from the sale of said trust lands, until said percentage shall amount to the sum of eighty thousand dollars, shall be placed to the credit of the school fund of said Indians; and the interest thereon, at the rate of five per centum per annum, shall be expended semi-annually for the boarding, clothing, and education of the children of said tribe." 14 Stat. 687, 692.

After this treaty and apparently for the purpose of protecting and fulfilling its provisions, various acts and joint resolutions were passed by Congress which are to be taken into consideration when disposing of this case.

A joint resolution was passed April 10, 1869, declaring: "That any *bona fide* settler residing upon any portion of the lands sold to the United States, by virtue of the first and

second articles of the treaty concluded between the United States and the Great and Little Osage tribe of Indians, September twenty-ninth, eighteen hundred and sixty-five, and proclaimed January twenty-first, eighteen hundred and sixty-seven, who is a citizen of the United States or shall have declared his intention to become a citizen of the United States, shall be, and hereby is, entitled to purchase the same in quantity not exceeding *one hundred and sixty acres*, at the price of one dollar and twenty-five cents per acre, within two years from the passage of this act, under such rules and regulations as may be prescribed by the Secretary of the Interior: *Provided, however*, That both the odd and even-numbered sections of said lands shall be subject to settlement and sale as above provided: *And provided, further*, That the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for state school purposes in accordance with the provisions of the act of admission of the State of Kansas: *Provided, however*, That nothing in this act shall be construed in any manner affecting any legal rights heretofore vested in any other party or parties." 16 Stat. 55.

In the act of July 15, 1870, c. 296, making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes, provision is made for the removal of the Great and Little Osage Indians whenever they agree thereto from their lands in Kansas "to lands provided or to be provided for them for a permanent home in the Indian Territory," the lands so to be provided "to be paid for out of the proceeds of the sales of their lands in Kansas." The sum of $50,000 was appropriated to meet the expenses of such removal and to aid in subsisting the Indians during the first year; "to be reimbursed to the United States from the proceeds of the sale of the lands of the said Indians in Kansas, including the trust lands north of their present diminished reservation, which lands shall be open to settlement after survey, excepting the sixteenth and thirty-sixth sections, which shall be reserved to the State of Kansas for school purposes, and shall be sold to *actual settlers* only, said settlers being heads of families, or over

twenty-one years of age, in quantities not exceeding one hundred and sixty acres, in square form, to each settler, at the ·price of one dollar and twenty-five cents per acre ; payment to be made in cash within one year from·the date of settlement or of the passage of this act ; and the United States, in consideration of the relinquishment by said Indians of their lands in Kansas shall pay annually interest on the amount of money received as proceeds of sale of said lands at the rate of five per centum, to be expended by the President for the benefit of said Indians in such manner as he may deem proper." 16 Stat. 335, 362.

By an " act for the relief of settlers on the Osage lands in the State of Kansas," approved May 9, 1872, c. 149, it was provided : " That the Osage Indian trust and diminished reserve lands in the State of Kansas, excepting the sixteenth and thirty-sixth sections in each township, shall be subject to disposal, *for cash only*, to actual settlers, in quantities not exceeding one hundred and sixty acres, or one-quarter section to each, in compact form, in accordance with the general principles of the preëmption laws, under the direction of the Commissioner of the General Land Office : *Provided*, That claimants shall file their declaratory statements as prescribed in other· cases upon unoffered lands, and shall pay for the tracts, respectively, settled upon within one year from date of settlement where the plat of survey is on file at that date, and within one year from the filing of the township plat in the district office where such plat is not on file at date of settlement." An actual settler upon those lands who had failed to pay for and enter the land settled upon by him under the act of July 15, 1870, was given three months in which to file his declaratory statement, and he was required to prove his claim and pay for the land before January 1, 1873, interest at the rate of 5 per cent to be paid from the day when payment should have been made under the act of 1870. 17 Stat. 90.

On the 23d day of June, 1874, Congress passed an act, (c. 488,) declaring " that all actual settlers upon the Osage Indian trust and diminished reserve lands in the State of Kansas

shall be allowed one year from the passage of this act in which to make proof and payment : *Provided*, That all purchasers who avail themselves of the provisions of this act shall pay interest on the purchase price of their lands at the rate of five per centum from the date when payment was required by previous laws to date of actual payment : *And provided further*, That no further extension of payment shall be granted than that provided for in this act, and that all occupants now upon said Osage lands shall file their application to purchase the lands occupied by them within three months after the passage of this act, or forfeit all right or claim to the same." 18 Stat. 283.

By an act approved August 11, 1876, c. 259, providing for the sale of Osage ceded lands in Kansas to actual settlers, the privilege was given to any *bona fide* settler, a citizen of the United States, or who had declared his intention of becoming such, and residing at the time of completing his or her entry, as in that act prescribed, upon any portion of the lands sold to the United States by the treaty of 1865–1867 with the Great and Little Osage tribes, to purchase the same, not exceeding 160 acres, at the price of $1.25 per acre, within one year from the passage of the act under such rules and regulations as may be prescribed by the Secretary of the Interior ; the purchaser paying one-fourth of the price at the time of his entry and the remainder, with 5 per cent interest, in three annual payments, notes therefor to be given to the United States. 19 Stat. 127, 128, §§ 1, 3.

Then came the act of May 28, 1880, c. 107, "for the relief of settlers upon the Osage trust and diminished reserve lands in Kansas." The first section gives sixty days after a day to be fixed by public advertisement in the proper land districts, (not later than ninety days after the passage of the act,) within which actual settlers on such lands may prove their claims and pay the purchase price, one-fourth in cash, and the balance in three annual instalments. In case of default the lands were to be sold as provided in the act. By other sections it is provided : " Sec. 2. That all the said Indian lands remaining unsold and unappropriated and not embraced in the claims pro-

vided for in section one of this act, shall be subject to disposal to actual settlers only, having the qualifications of *preëmptors* on the public lands.   Such settlers shall make due application to the register with proof of settlement and qualifications as aforesaid ; and, upon payment of not less than one-fourth the purchase price shall be permitted to enter not exceeding one quarter section each, the balance to be paid in three equal instalments, with like penalties, liabilities and restrictions as to default and forfeiture as provided in section one of this act. SEC. 3. All lands upon which such default has continued for ninety days shall be placed upon a list, and the Secretary of the Interior shall cause the same to be duly proclaimed for sale in the manner prescribed for the offering of the public lands, . . . but such lands . . . *shall be sold for cash* to the highest bidder at not less than the price fixed by law ;  . . . and if any of said lands shall remain unsold after the offering as aforesaid, they shall be subject to private entry for cash in tracts not exceeding one quarter section by one purchaser." 21 Stat. 143.

In the same year an act was passed, June 16, 1880, c. 251, to carry into effect the second and sixteenth articles of the treaty of 1865, proclaimed January 21, 1867.  The preamble of the act is as follows : " Whereas, by the act for the admission of the State of Kansas into the Union, approved January twenty-ninth, eighteen hundred and sixty-one, the United States granted to said State the sixteenth and thirty-sixth sections ' of every township of public lands in said State,' but especially provided that the lands embraced within the Indian reservations in said States should not be alienated for any purpose except with the consent of the Indians of such reservations, and in accordance with the conditions of the treaty authorizing such alienation ; and whereas, by the treaty between the United States and the Great and Little Osage Indians, proclaimed January twenty-first, eighteen hundred and sixty-seven, a trust was created for the disposal of the lands of said Indians in the State of Kansas, the metes and bounds of which said lands are specifically set forth in said treaty, by which the United States bound itself to convey and sell any and all of such lands

' at a price not less than one dollar and twenty-five cents per acre, as other lands are surveyed and sold,' and to place ' the proceeds of such lands as they accrue, after deducting all expenses incident to the proper execution of the trust, . . . in the Treasury of the United States to the credit of said tribe of Indians;' and whereas it is claimed that under the operation of the treaty herein referred to there are moneys due, both on account of grants and sales of lands which have not been placed to the credit of said Indians, as provided for in said treaty."

The act provided: " That the Secretary of the Interior is hereby authorized and directed to cause an account to be stated of the number of acres of the Osage lands in the State of Kansas that have in any way been alienated by the United States, either by the act of January twenty-ninth, eighteen hundred and sixty-one, entitled ' An act for the admission of Kansas into the Union,' or since the creation of the trust for the sale of these lands by the treaty between the United States and the Great and Little Osage Indians, proclaimed January twenty-first, eighteen hundred and sixty-seven, and of the money received by the United States on account of the sales of such lands, and to certify the difference between the sum so received and the sum that would be due said trust at the date of the account herein provided for, had all of said lands so alienated been disposed of as provided for by said treaty. That a sum of money equal to the amount certified by the Secretary of the Interior, in pursuance of the foregoing section, to the Secretary of the Treasury, is hereby appropriated out of any money in the Treasury not otherwise appropriated, which the Secretary of the Treasury is directed to place to the credit of the Secretary of the Interior, as custodian of said trust funds, and, after defraying the cost of survey and sale of said lands and other expenses contracted by the United States or the Osage Nation in the execution of said trust, the balance of said funds shall be placed in the Treasury of the United States, to the credit of said Indians, to be invested and distributed in accordance with existing treaties: *Provided*, That a like settlement shall be made with the Indian-civilization fund for the sixteenth and thirty-sixth sections, given by the

United States to the State of Kansas, within the limits of the Osage lands ceded by the first article of the treaty aforesaid." 21 Stat. 291.

This brings us to the act approved December 15, 1880, c. 1, the preamble of which declares that the Fort Dodge military reservation was no longer needed for military purposes. That act made it " the duty of the Secretary of the Interior to cause all that portion of the Fort Dodge military reservation, in the State of Kansas, being and lying north of the land owned and occupied by the Atchison, Topeka and Santa Fé Railroad Company for right of way for its railroad; (and to cause the same) to be surveyed, sectionized, and subdivided as other public lands, and after said survey to offer the said lands to actual settlers only, under and in accordance with the homestead laws of the United States : *Provided,* That the said Atchison, Topeka and Santa Fé Railroad Company shall have the right to purchase such portion of said reservation as it may need for its use adjoining that now owned by it, not exceeding 160 acres, by paying therefor the price at which the same may be appraised under the direction of the Secretary of the Interior." 21 Stat. 311.

The lands here in dispute are within the overlapping limits of the Osage trust and diminished reserve lands and of the Fort Dodge military reservation, and lie north of the land owned and occupied by the Atchison, Topeka and Santa Fé Railroad Company for right of way for its railroad.

As already stated, Frost had in view, when making his entry, the provisions of the act of Congress of December 15, 1880. He immediately settled on the land and within six months built a house and moved his family into it. One Boyd filed a preëmption statement for the lots applied for by Frost as well as for other lots. He subsequently relinquished all claim to so much of the land as conflicted with Frost's claim.

On the 5th day of November, 1881, Wenie, the appellee, filed his preëmption declaratory statement for the land embraced in Frost's entry. He proceeded under the act of May 28, 1880. Wenie's, as well as Boyd's, application was rejected by the local land officers, and that ruling was sustained by the Com-

missioner of the General Land Office and by the Secretary of the Interior. Frost then proceeded to make his final proofs and they were accepted by the local land officers. He paid $110.80 for the land, taking the benefit of section 2301 of the Revised Statutes, which allowed payment of the minimum price for land entered at any time before the expiration of five years.

Wenie appealed, but his appeal was dismissed by the Commissioner of the General Land Office. He then appealed to the Secretary of the Interior, and on the 5th day of October, 1887, Acting Secretary Muldrow reversed the ruling of the Commissioner. 6 L. D. 175. Thereupon the homestead entry of Frost was cancelled and Wenie was permitted to perfect his preëmption filing of November 5, 1881. Upon a review of the decision of Acting Secretary Muldrow it was affirmed by Secretary Vilas. *Wenie* v. *Frost*, 6 L. D. 539. This decision was followed by one rendered by Secretary Noble, recognizing the previous ruling by his predecessor. *Frost* v. *Wenie*, 9 L. D. 588. On the 20th day of January, 1890, a patent was duly issued to Wenie.

It was admitted that Frost had previously exercised his right under the law, as a preëmptor, to purchase Osage lands.

The decree below sustained the action of the Interior Department, and the bill being held insufficient upon demurrer, was dismissed with costs to the defendant.

*Mr. W. T. S. Curtis* and *Mr. Samuel Shellabarger* for appellant. *Mr. A. A. Hoehling, Jr.*, was on their brief.

*Mr. Frederic D. McKenney* for appellees. *Mr. S. F. Phillips* and *Mr. William H. Lamar* were on his brief.

MR. JUSTICE HARLAN, after stating the facts, delivered the opinion of the court.

The act of May 28, 1880, for the relief of settlers upon the Osage trust and diminished reserve lands in Kansas, provided that all of those Indian lands remaining unsold and unappropriated (and not embraced in certain claims which it is unnec-

essary here to mention) shall be subject to disposal to actual
settlers only, "having the qualifications of preëmptors on the
public lands" — each settler being permitted "to enter not
exceeding one quarter section each."

The act of December 15, 1880, directed the Secretary of the
Interior to cause all that portion of the Fort Dodge military
reservation lying north of the right of way of the Atchison,
Topeka and Santa Fê Railroad to be surveyed, sectionized,
and subdivided "as other public lands," and after survey "to
offer the said lands to actual settlers only, under and in accord-
ance with the homestead laws of the United States."

Only about one twenty-fifth part of the lands embraced in
so much of the Fort Dodge military reservation as is described
in the last-named act were Osage trust lands. 6 L. D. 541.

Did Congress intend, by the act of December 15, 1880, to
open to entry by homesteaders lands of the class which, by
the act of May 28, 1880, were opened to entry only by actual
settlers having the qualifications of preëmptors?

It is to be observed that although the words of the act of
December 15, 1880, are broad enough, if literally interpreted,
to embrace *all* the lands within the abandoned Fort Dodge
military reservation north of the Atchison railroad, there are
no words in it of express repeal of any former statute. It is
well settled that repeals by implication are not to be favored.
And where two statutes cover, in whole or in part, the same
matter, and are not absolutely irreconcilable, the duty of the
court — no purpose to repeal being clearly expressed or indi-
cated — is, if possible, to give effect to both. In other words,
it must not be supposed that the legislature intended by a
later statute to repeal a prior one on the same subject, unless
the last statute is so broad in its terms and so clear and
explicit in its words as to show that it was intended to cover
the whole subject, and, therefore, to displace the prior statute.
*McCool* v. *Smith*, 1 Black, 459, 468; *United States* v. *Tynen*,
11 Wall. 88, 93; *Red Rock* v. *Henry*, 106 U. S. 596, 601;
*Henderson's Tobacco*, 11 Wall. 652; *King* v. *Cornell*, 106 U. S.
395, 396.

There is an interpretation of the act of December 15, 1880,

that will give effect to its provisions, and at the same time leave untouched the prior act as expressing the will of Congress in respect of the Osage trust and diminished reserve lands. That interpretation assumes that Congress did not intend by that act to prescribe for the Osage trust lands within the limits of the abandoned Fort Dodge military reservation, north of the Atchison railroad, any different rule or policy than had been prescribed by the act of May 28, 1880, for all such trust lands wherever situated. Excluding from the operation of the act of December 15, 1880, any lands affected with an express trust in favor of Indians, that is, construing it as applying only to public lands, strictly so called, which the United States could dispose of without any breach of good faith or violation of treaty obligations, there is no difficulty in giving effect to the provisions as well of that act as of the act of May 28, 1880, without infringing any established principle for the interpretation of statutes. No trace can be discovered in the various legislative enactments relating specifically to the Osage trust lands of any intention, upon the part of Congress, to disregard the terms of its treaties with the Osage Indians; and, consequently, the act of December 15, 1880, should not be construed as impairing the rights of the Indians, unless such a construction be unavoidable. It is not unavoidable. Looking at that act, in connection with prior statutes, particularly that of May 28, 1880, we are of opinion that the lands which the act of December 15, 1880, directed to be opened for entry under the homestead laws, were public lands that were within the abandoned military reservation, and subject to disposition under general laws relating to "other public lands," and not lands of an exceptional class that were affected with a trust established for the benefit of Indians by treaty. Acting Secretary of the Interior Muldrow said : " However we may construe the act of December 15, 1880, with reference to the disposal of the greater part of the reservation relinquished by said act lying north of the Osage lands, it should not be so construed as to impair or defeat the rights of the Indians guaranteed by the treaty of 1865." 6 L. D. 175.

Application having been made to Secretary Vilas for a review of that decision, that officer, among other things, said: "I am satisfied that Congress, by the act of December 15, 1880, had no intention of repealing the act of May 28, 1880, or any portion thereof, since such repeal would work an impairment of the rights guaranteed to the Indians by the treaty of 1865. Especially do I think this view is warranted in the absence of any express words of repeal; for, had Congress intended a repeal the effect of which would be to disregard treaty obligations, or to defeat or impair treaty rights, I feel certain it would have expressed that intention in plain words and not left it to implication. How, then, is the act of December, 1880, in so far as it is in apparent conflict with the act of May 28, 1880, (which is as to less than three sections of land,) to be construed? Manifestly, the intention of Congress can be ascertained only by a consideration of the treaty of 1865, and the two acts above mentioned *in pari materia;* and so considering them, I have no difficulty in arriving at the conclusion that the tract in question cannot be legally entered by Frost for the reason that having made one Osage entry he is not a qualified preëmptor." 6 L. D. 540.

We approve the construction placed upon the act of December 15, 1880, by the Interior Department, and the decree is

*Affirmed.*