## CHASE v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. December 12, 1916.)

### No. 4613.

1. INDIANS ☞13—LANDS—ALLOTMENTS IN SEVERALTY—CONSTRUCTION OF STATUTE.

Act Aug. 7, 1882, c. 434, 22 Stat. 341, provided for allotments in severalty from a designated part of the Omaha Indian reservation in Nebraska to each member of the tribe, and that after such allotments were made the residue of such part of the reservation should be patented to the tribe, to be held in trust for 25 years and then patented in fee. Section 8 then provided that from such residue patented to the tribe in common "allotments shall be made and patented to each Omaha child who may be born prior to the expiration" of the trust period in the same quantity and subject to the same restrictions as provided in respect to the general allotment. By Act March 3, 1893, c. 209, 27 Stat. 630, the Secretary of the Interior was "authorized," with the consent of the tribe, to make allotments in severalty from such residue held in trust to each woman and

child of the tribe born since the general allotment "and now living" of double the quantity of land provided for in the act of 1882, and to each allottee who received only 40 acres under the general allotment 40 acres additional. *Held,* that in view of the general policy of Congress, as shown by the treaties with the tribe in 1854 and 1865, to promote individual ownership, such act did not by implication repeal the positive provision of section 8 of the act of 1882 requiring an allotment to each child born during the trust period, although such child, if born after the passage of the later act, was not entitled to the increased allotment provided for therein.

[Ed. Note.—For other cases see Indians, Cent. Dig. § 30; Dec. Dig. ☞13.]

2. INDIANS ☞13—CONSTRUCTION OF CONGRESSIONAL ACTS RELATING TO.

Provisions of doubtful meaning in congressional enactments relating to Indians must be construed so far as possible in favor of the Indians, and not against them.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. ☞13.]

3. STATUTES ☞161(1), 225—CONSTRUCTION—STATUTES IN PARI MATERIA.

All statutes in pari materia are to be read and construed together as if they formed part of the same statute, and when there are two acts on the same subject they must stand together, if possible, and if repugnant in any of their provisions, the later act operates as a repeal of the earlier one so far, and only so far, as its provisions are repugnant to those of the earlier act.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 230, 233, 234, 302, 303; Dec. Dig. ☞161(1), 225.]

Appeal from the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Suit in equity by Hiram Chase, Jr., a minor, by his next friend, Hiram Chase, Sr., against the United States. Decree for the United States, and complainant appeals. Reversed.

John Lee Webster, of Omaha, Neb. (Hiram Chase, of Pender, Neb., on the brief), for appellant.

A. W. Lane, Asst. U. S. Atty., of Lincoln, Neb., and O. C. Anderson, of West Point, Neb. (T. S. Allen, U. S. Atty., of Lincoln, Neb., on the brief), for appellee.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

PER CURIAM. This suit was instituted under the provisions of an act of Congress approved February 6, 1901 (31 Stat. 760 [Comp. St. 1913, §§ 4214, 4215]), by Hiram Chase, Jr., by his next friend, Hiram Chase, Sr., a member of the Omaha Tribe of Indians, to secure a decree for an allotment of land in the Omaha reservation which had been denied to him by the Secretary of the Interior. He alleged in his amended bill facts which he claims entitled him to such a decree. The United States appeared in due time and moved to dismiss the bill, on the ground that its allegations were not sufficient to constitute a cause of action. This motion was sustained, and, plaintiff declining to plead further, the bill was dismissed; and he now appeals, assigning for error that the court erred in dismissing the bill, and in not holding that on the facts stated plaintiff was entitled to the decree prayed for.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

A summary of the facts alleged by him is as follows:

Plaintiff was born December 3, 1895, of parents both of whom were members of the Omaha Tribe, and afterwards caused to be selected and now claims an allotment of the W. ½ of the N. W. ¼ of section 25, township 25, range 9 east of the sixth principal meridian. In 1854, by a treaty then made between the United States and the Omaha Tribe (10 Stat. 1043), that tribe, for a valuable consideration paid to it, ceded to the United States the southern portion of a tract of land then occupied by them; the northern portion thereof being reserved and set apart to the Indians for their future home. Pursuant to the obligation of the treaty they soon vacated the land so ceded to the United States, and removed to that reserved and set apart to them. In this treaty, power was conferred upon the President to cause the land reserved to the Indians to be surveyed into lots, and to assign to individual Indians, who might desire to make for themselves a permanent home, certain quantities of land for that purpose, and to issue to them patents therefor, subject, however, to certain reasonable restrictions against alienation and to other prescribed conditions.

In 1865, by treaty then made (14 Stat. 667), the Omaha Tribe ceded to the United States, for a valuable consideration, a tract of land from the northern portion of their reservation; and the Indians expressing a desire of promoting settled habits of industry and enterprise amongst themselves by abolishing the tenure in common by which they had theretofore held their lands and of securing assignments of limited quantities thereof in severalty to the individual members of the tribe, it was by article IV agreed that the remaining portion of their reservation should be set apart for those purposes, and that out of the same there should be assigned to each head of a family not exceeding 160 acres, and to each male person, 18 years of age and upwards, without a family, not exceeding 40 acres of land, and that the whole of the land, assigned or unassigned in severalty, should constitute and be known as the Omaha reservation; that such assignments, when approved by the Secretary of the Interior, should be final and conclusive; and that certificates should be issued by the Commissioner of Indian Affairs for the tracts so assigned, specifying the names of the individuals to whom the same were assigned respectively.

On August 7, 1882, Congress passed an act (22 Stat. 341), section 5 thereof authorizing the Secretary of the Interior to allot the part of the reservation lying east of the Sioux City & Nebraska Railroad, in severalty, to the members of that tribe in quantities as follows: To each head of a family, a quarter section; to each single person over 18 years of age, one-eighth of a section; to each orphan child under 18 years of age, one-eighth of a section; and to each other person under 18 years of age, one-sixteenth of a section. These allotments to be in lieu of allotments or assignments provided for in the fourth article of the treaty of 1865. Section 6 of the act provided for the issuance of patents in the names of the allottees, declaring that the United States will hold the land thus allotted for the period of 25 years in trust for the sole use and benefit of the Indians to whom such allotment shall have been made. Section 8 provided that the residue of

lands lying east of the railroad, after all allotments have been made, as in the fifth section provided, shall be patented to the Omaha Tribe of Indians, the patent to have the legal effect and declare that the United States does and will hold the land thus patented for the period of 25 years in trust for the sole use and benefit of the tribe, and at the expiration of that period the United States will convey the same by patent to the tribe in fee, discharged of the trust and free from all incumbrances whatsoever. Section 8 also provides, as will hereafter more fully appear, that from the residue of land thus patented to the tribe in common allotments should be made and patented to each Omaha child who may be born prior to the expiration of the time during which it is provided the land shall be held in trust by the United States.

Allotments under this act had been made prior to July 11, 1884, to 954 members of the tribe, and these were duly approved on that date and patents issued therefor. The trust period of 25 years for such allotments would therefore expire on July 10, 1909. The United States failed to issue the patent to the tribe, as provided in section 8 of the act of 1882; but this is conceded to have been an unimportant omission of a ministerial duty only, and that the rights of the members of the tribe therein are not affected by the omission.

The act of March 3, 1893 (27 Stat. 630, c. 209), authorized the Secretary of the Interior, with the consent of the Indians of the tribe, to allot in severalty " *   *   *   to each Indian woman and child of said tribe born since allotments of land were made in severalty to the members thereof under the provisions of said act (1882), and *now living*, one-eighth of a section of the residue lands held by that tribe in common, instead of one-sixteenth of a section, as therein provided, and to allot in severalty to each allottee under said act, *now living*, who received only one-sixteenth of a section thereunder, an additional one-sixteenth of a section of such residue lands.   *   *   * "

The question for decision is whether, in view of the foregoing facts and statutes, the fact that plaintiff in this case was not born until after the act of 1893 was passed, disqualified him to the allotment selected by him.

[1] While the provisions of the two acts of 1882 and 1893 furnish the main criteria by which this question must be answered, the treaties of 1854 and 1865 are relied on by plaintiff's counsel as having an important bearing on the question, their contention being that the cessions of lands to the United States by those treaties afforded a valuable and sufficient consideration for the stipulation in the first treaty empowering the President to survey the reservation, and to assign to such Indians as desired it certain specified areas of land for their permanent home, and to issue to them patents therefor, and for the stipulation in the second treaty abolishing tenure in common and providing for the assignment of the land in severalty to the members of the tribe, without limitation as to time. The contention is that the right of the individual members of the tribe, for whose benefit the treaties were made, to such allotments, was a contract right, made so by the terms of the treaty of 1865, and confirmed by the provisions of the act of 1882, of which they could not be deprived without their consent.

A critical reading and consideration of the treaties themselves fails to convince us of the merit of this contention. By the terms of the treaty of 1854 no obligation to make any assignments to individual members of the tribe was assumed or undertaken by the United States. The President was merely given discretionary power to do so, if, in his judgment, the best interests of the Indians and of all parties concerned would thereby be best promoted; and the immediate object of the treaty of 1865 was to secure a reservation or home on the northern part of the Omaha reservation for the Winnebago tribe of Indians, as we understand. Incidental to this main object an effort seems to have been made to induce the Indians to abandon their tribal customs and to take up the habits of civilized life. This appears by the recitations found in the treaty to the effect that the Indians were desirous of "promoting settled habits of industry and enterprise amongst themselves by abolishing the tenure in common by which they now hold their lands, and by assigning limited quantities thereof in severalty to the members of the tribe. * * *"

So it appears that neither of the treaties obligated the United States to abolish tenure in common or made any general scheme for the assignment of lands in severalty. It is true the treaty of 1865 made provision, as a step in the way of abolishing tenure in common and promoting the desired habits of industry and enterprise, for setting apart the remaining portion of the reservation and assigning to limited classes of persons, then in existence, certain quantities of land. But there was no such definiteness in this as to constitute a contract obligation requiring the government to make an allotment of land to the plaintiff in this case. Both treaties, however, disclose a general policy looking toward the abolishment of the tribal ownership of land and the division of it into individual holdings, and this policy, we think, has an important bearing on the construction of congressional enactments relied on by counsel.

By the act of 1882 Congress, for the first time, provided a general scheme of alloting lands lying east of the right of way of the Sioux City & Nebraska Railroad and of issuing patents therefor to the members of the tribe in severalty. Such allotments were to be in lieu of the assignments tentatively contemplated by the fourth section of the treaty of 1865. The patents thus authorized were made to declare that the United States will hold the land so allotted for a period of 25 years in trust for the sole use and benefit of the Indians to whom the allotments may have been made or in case of their death, in trust for their heirs. Section 8 of that act provides that the residue of lands lying east of that right of way, after all allotments have been made as authorized, shall be patented to the Omaha Tribe, the patent to have the legal effect and declare that the United States will hold the lands thus patented in trust for the period of 25 years for the sole use and benefit of the tribe, and at the expiration of that period that the United States will convey the lands to the tribe in fee, discharged of the trust and free from all charge and incumbrance whatsoever. Then in section 8 the following important provision is found:

"That from the residue of lands thus patented to the tribe in common, allotments shall be made and patented to each Omaha child who may be born prior to the expiration of the time during which it is provided that said lands shall be held in trust by the United States, in quantity and upon the same conditions, restrictions, and limitations as are provided in section 6 of this act, touching patents to allottees therein mentioned. But such conditions, restrictions, and limitations shall not extend beyond the expiration of the time expressed in the patent herein authorized to be issued to the tribe in common: And provided further, that these patents, when issued, shall override the patent authorized to be issued to the tribe as aforesaid, and shall separate the individual allotment from the lands held in common, which proviso shall be incorporated in the patent issued to the tribe: Provided, that said Indians or any part of them may, if they shall so elect, select the land which shall be allotted to them in severalty in any part of said reservation either east or west of said right of way mentioned in the first section of this act."

If Chase had been born at any time prior to the expiration of the 25 years after the approval of the allotments provided for in the fifth section of the act (which was in 1884), that is, prior to 1909, he would have, according to the language of section 8, unaffected by subsequent legislation, been entitled to the allotment of 40 acres of the 80 acres selected by him. The only question then is whether subsequent legislation, interpreted in the light of prior treaties, deprived him of that right.

As already seen, the prior treaties contain provisions looking towards a scheme for abolishing tenures in common and substituting therefor allotments of land to individual Indians in severalty. In the execution of this general scheme the act of 1882 was passed. After providing for allotments in severalty to members of the tribe of land lying east of the railroad and for the patenting of the residue of the reservation to the tribe, it enacts as follows:

"That from the residue of lands thus patented to the tribe in common, allotments shall be made and patented to each Omaha child who may be born prior to the expiration of the time during which it is provided that said lands shall be held in trust by the United States. * * *"

This language is comprehensive and imperative. It commands that allotments shall be made to every child of the tribe who may be born within the specified period of 25 years, ending in 1909. This, we think, clearly means that so long as any lands remain unallotted out of that particular residue each child born within the specified period shall have an allotment. This, we think, would not be questioned except for the provisions of the act of 1893, upon which the United States especially relies. That act is in the following words:

Be it enacted: "That the act of Congress approved August seventh, eighteen hundred and eighty-two, entitled 'An act to provide for the sale of a part of the reservation of the Omaha Tribe of Indians in the state of Nebraska, and for other purposes,' be, and the same is hereby, amended so as to authorize the Secretary of the Interior, with the consent of the Indians of that tribe, to allot in severalty, through an allotting agent of the Interior Department, to each Indian woman and child of said tribe born since allotments of land were made in severalty to the members thereof under the provision of said act, and *now living*, one-eighth of a section of the residue lands held by that tribe in common, instead of one-sixteenth of a section, as therein provided, and to allot in severalty to each allottee under said act, *now living*, who received only one-sixteenth of a section thereunder, an additional one-sixteenth

of a section of such residue lands: Provided, that the allotments so made shall be subject to the same conditions, restrictions, and limitations provided for in sections six, seven, and eight of said act, touching allotments and patents to allottees therein mentioned: And provided, that the expenses incurred in making the allotments hereby authorized shall be defrayed out of the funds appropriated for surveying and allotting Indian reservations."

By this act Congress granted an allotment of 40 acres more to each allottee living at the time of its passage who had received but 40 acres, and it also granted to each Indian woman and to each child of the tribe born since allotments of lands had been made who was living at the passage of the act, a right to an allotment of 80 acres of land. It increased the grants to individual Indians and contained no provision for decreasing or revoking them, or any of them.

The act of 1882, in unequivocal and emphatic language, had conferred the right to an allotment upon each and every Omaha child who might be born at any time prior to the expiration of 25 years, after the approval of the allotments; that is, to any child that might be born after the year 1884 and prior to 1909. This was a right conferred in clear terms upon a clearly defined class, to be constituted in the future; and even if not an enforceable right, so far as plaintiff Chase was concerned, at the time of the passage of the act, it clearly evidences the purpose of Congress that it should be available to each constituent member as he or she might later, by birth, be incorporated into the class. Therefore, unless this act, in so far as if confers this right, was repealed by the act of 1893, it still exists in favor of the plaintiff in this case.

[2] The act of 1882 was certainly not repealed in terms, and we do not think it was repealed by implication, because, as a rule, repeals by implication are not favored, and should not be so held unless the implication is clear. In our opinion there is no such clear implication manifested in the act of 1893, for these reasons:

(1) The Congress did not say the former act or any of its provisions were repealed, but did say that the act was merely "amended."

(2) Provisions of doubtful meaning in congressional enactments, relating to Indians, must be construed so far as possible in favor of the Indians, and not against them.

The Supreme Court of the United States, in the case of Choate v. Trapp, 224 U. S. 665, 675, 32 Sup. Ct. 565, 569 (56 L. Ed. 941), in answering the contention that certain claims for exemptions there under consideration must be strictly construed, make use of this language:

"But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years, and has been applied in tax cases."

In Chase v. United States, 138 C. C. A. 117, 121, 222 Fed. 593, 597, it was said by this court:

"And because, when treaties were made with them, the Indians were unfamiliar with the language in which they were written and with the exact

meaning of many of the terms used in them, they must be construed liberally, doubtful expressions must be resolved in favor of the Indians, and the treaties must be interpreted, 'not according to the technical meaning of their words, * * * but in the sense in which they would naturally be understood by the Indians.'"

[3] (3) There is no inconsistency or repugnancy between the grant of allotments of tracts of 40 acres to the plaintiff and the members of his class under the act of 1882 and the grants to the classes of Indians specified in the act of 1893, and "all statutes in pari materia are to be read and construed together as if they formed part of the same statute." Potter, Dwarris on Statutes, 145. When there are two acts on the same subject, they must stand together, if possible. If the two are repugnant in any of their provisions, the later act operates as a repeal of the earlier one so far, and only so far, as its provisions are repugnant to those of the earlier act. In re Henderson's Tobacco, 11 Wall. 652, 657, 20 L. Ed. 235; Frost v. Wenie, 157 U. S. 46, 57, 58, 15 Sup. Ct. 532, 39 L. Ed. 614; Board of Com'rs v. Ætna Life Ins. Co., 90 Fed. 222, 227, 32 C. C. A. 585, 590; City Realty Co. v. Robinson Contracting Co. (C. C.) 183 Fed. 176, 181. And the conclusion is that the grant to plaintiff by the act of 1882 of the right to his allotment of 40 acres of land has never been repealed nor revoked, and it still exists. He has selected 80 acres on the theory that the act of 1893 granted to him the right to an additional 40 acres; but the grant of that act to children was clearly and expressly limited to children living at the date of the passage of the act, and it was passed more than a year before the plaintiff was born. He does not, therefore, fall within any of the classes to which a grant was made by that act, and he is entitled to only 40 acres of land; but he may take that 40 acres out of the 80 acres he has selected for his allotment by virtue of the provisions of the act of 1882, with the same right as though he had selected the 40 acres when he selected the 80 acres.

The result is that the amended complaint sets forth facts which entitle the plaintiff to relief in equity, and that the decree which dismissed it was erroneous. Let the decree below be reversed, and let the case be remanded to the District Court, with instructions to permit the defendant to answer, if so advised; and it is so ordered.

⬥⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes