26 C.C.P.A.(Customs)

## JOHN T. BILL CO., Inc., et al. v. UNITED STATES.

### Customs Appeal No. 4073.

Court of Customs and Patent Appeals, May 29, 1939.

Lawrence A. Harper, of San Francisco, Cal. (Abraham Gottfried, of Los Angeles, Cal., of counsel), for appellants.

Webster J. Oliver, Asst. Atty. Gen. (Charles J. Miville, of New York City, Sp. Atty., of counsel), for the United States.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LEN-ROOT, Associate Judges.

GARRETT, Presiding Judge.

In this appeal from the judgment of the United States Customs Court, Third Division, there are involved two protests of importers (the cases having been consolidated for trial) by which they seek to recover such duties as were assessed as countervailing duties upon merchandise described as bicycle parts imported from Germany. The merchandise covered by protest No. 557514—G was entered July 6, 1931 and that covered by protest No. 747844—G May 18, 1934. The issue involved in both protests is identical.

The merchandise was classified under paragraph 371 of the Tariff Act of 1930, 46 Stat. 625, which reads:

"Par. 371. Bicycles, and parts thereof, not including tires, 30 per centum ad valorem: Provided, That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, in excess of the duty herein provided, there shall be imposed upon such article, when imported either directly or indirectly from such country, dependency, province, or other subdivision of government, a duty equal to that imposed by such country, dependency, province, or other subdivision of government on such article imported from the United States, but in no case shall such duty exceed 50 per centum ad valorem."

The first importation was assessed with duty at 50 per centum ad valorem, the collector citing as authority T.D. 42382, which

is a Treasury Decision published October 5, 1927, wherein the Secretary of the Treasury advised "for * * * information in connection with the assessment of duty under paragraphs * * * 371 * * *" that Germany exacted a duty of 100 marks per 100 kilos on bicycle parts of worked iron when imported from the United States. The second importation was likewise assessed, the authority cited being T.D. 46329, published April 19, 1933, which, so far as here material, was the same in purport as T.D. 42382. It is noted that in T.D. 46329 it was stated that the German rates had been in effect since September 6, 1932, or earlier.

It will be observed that paragraph 371, supra, provides a normal duty rate of 30 per centum ad valorem. The duties resulting from that rate are not here in question, it being claimed in both protests that the assessments should be at that rate. The protests did contain other claims but these were not relied on below nor are they here at issue.

The protests are predicated upon the treaty between the United States and Germany proclaimed October 14, 1925, 44 Stat. 2132, particularly upon Article VII thereof which, so far as here pertinent, reads:

"Each of the High Contracting Parties binds itself unconditionally to impose no higher or other duties or conditions and no prohibition on the importation of any article, the growth, produce or manufacture, of the territories of the other than are or shall be imposed on the importation of any like article, the growth, produce or manufacture of any other foreign country.

"Each of the High Contracting Parties also binds itself unconditionally to impose no higher or other charges or other restrictions or prohibitions on goods exported to the territories of the other High Contracting Party than are imposed on goods exported to any other foreign country.

"Any advantage of whatsoever kind which either High Contracting Party may extend to any article, the growth, produce, or manufacture of any other foreign country shall simultaneously and unconditionally, without request and without compensation, be extended to the like article the growth, produce or manufacture of the other High Contracting Party.

    *    *    *    *    *    *

"With respect to the amount and collection of duties on imports and exports of every kind, each of the two High Contracting Parties binds itself to give to the nationals, vessels and goods of the other the advantage of every favor, privilege or immunity which it shall have accorded to the nationals, vessels and goods of a third State, and regardless of whether such favored State shall have been accorded such treatment gratuitously or in return for reciprocal compensatory treatment. Every such favor, privilege or immunity which shall hereafter be granted the nationals, vessels or goods of a third State shall simultaneously and unconditionally, without request and without compensation, be extended to the other High Contracting Party, for the benefit of itself, its nationals and vessels."

As a matter of historical interest it may be recited that the above treaty was negotiated following the Declaration of Peace between the United States and Germany in 1921 (42 Stat. 105), the negotiations being concluded and the treaty signed at Washington December 8, 1923. February 10, 1925, the Senate of the United States advised ratification with two reservations. Those reservations were accepted by the German Government which ratified the treaty August 20, 1925. It was ratified by the President of the United States October 6, 1925. Ratifications were exchanged at Washington October 14, 1925, and on that date the treaty was proclaimed by the President of the United States, 44 Stat. 2132. In Article XXXI of the treaty it was provided that it should remain in full force "for the term of ten years," and, under certain defined conditions, for a longer period. On June 3, 1935, an "Agreement between the United States of America and Germany terminating parts of Article VII", to become effective October 14, 1935, was signed by the Secretary of State of the United States and the German Ambassador, ratification of which was advised by the Senate of the United States August 24, 1935; by the President of the United States August 28, 1935, and by Germany September 28, 1935. Ratifications were exchanged at Berlin October 7, 1935, and the agreement was formally proclaimed by the President of the United States October 25, 1935, 49 Stat. 3258. The President of the United States in a letter under date of September 16, 1935, addressed to the Secretary of the Treasury and published in T.D. 47865, gave notice that on October 15, 1935, the United States would cease to be

bound by Article VII, "providing for most-favored-nation treatment in respect of customs duties."

That Article VII of the treaty was in full force at the time of the respective importations here involved is not in question and various Treasury Decisions are cited which show that at those times merchandise of the kind involved was admissible from other foreign countries at a duty rate of only 30 per centum ad valorem.

Stated briefly, it is the contention of appellants that the action of the collector in exacting a duty of 50 per centum ad valorem was in violation of the unconditional grant of most-favored-nation treatment accorded Germany in the above treaty in view of the fact that bicycle parts of worked iron were then admissible from other countries at a lower rate of duty. The entire contention rests upon the *unconditional* character of the treaty, it, in effect, being conceded that, upon the authority of a long line of decisions by both the executive and judicial branches of the Government, the most-favored-nation doctrine would not apply in this case were the treaty of the conditional type, such, for example, as the treaty with Belgium which was involved in the case of Minerva Automobiles, Inc. v. United States, 96 F.2d 836, 25 C.C.P.A., Customs, 324, T.D. 49424, where we held that a proviso of paragraph 369 of the Tariff Act of 1922, 42 Stat. 885, superseded the most-favored-nation clause of a conditional Belgian treaty "in respect to the countervailing duty on automobiles."

It is contended by counsel for the Government in their brief before us that our decision in that case is controlling in the instant case. In other words, they contend that the enactment of the countervailing duty provision of paragraph 371, supra, subsequent to the ratification of the treaty had the effect of superseding the most-favored-nation provision of the treaty.

As we interpret the decision of the trial court, that tribunal did not base its decision upon the view that the provision of the 1930 Tariff Act superseded the treaty provision (although it states, in effect, that if any conflict exists the act of Congress must prevail), but upon the view that the assessment "is not in contravention of the spirit of the most-favored-nation clause," it being said, "We simply pass on to German imports the excess of duty she levies against our merchandise when brought into her ports. Germany's relief lies entirely with her legislative body."

It is deemed proper here to take note of a decision rendered by the First Division of the United States Customs Court with which the decision in the instant case is in conflict. In the case of International Commerce Co. v. United States, T.D. 47493, 67 Treas.Dec. 142, there was involved a shipment of Portland cement from Germany. The case arose under the Tariff Act of 1922, the importation having been made after the effective date of the German Treaty. Paragraph 1543 of that act, 42 Stat. 926, provided for the admission of Portland cement duty free but contained a countervailing duty provision the same in principle as the proviso of paragraph 371 of the 1930 act, supra. The First Division in an opinion by McClelland, P. J. (Brown, J., concurring in the result), held, upon the basis of its construction of the pertinent language of the treaty, that the countervailing duty was improperly assessed. An appeal was taken to this court, but it was not prosecuted, and the same was dismissed upon stipulation May 29, 1935. 23 C.C.P.A., Customs, 391, T.D. 47493.

In the course of its decision in the instant case the Third Division (opinion by Evans, J.) declined to follow the reasoning and conclusion of the decision in the International Commerce Co. case, supra. It was pointed out that that case arose under the Tariff Act of 1922, but the issue of the instant case was not decided on that basis. The decision in the International Commerce Co. case, supra, made reference to a prior decision of the trial tribunal in the case of Douglas Fairbanks v. United States, T.D. 43643, where it was held that an automobile imported from Great Britain under the Tariff Act of 1922 was subject to a countervailing duty at a higher rate than that at which like merchandise was admitted when imported from other countries, and distinguished the two cases upon the ground that the treaty with Great Britain was conditional, saying, in substance, that the unconditional provisions of the German Treaty preclude any possibility of their being interpreted in the same manner as were the provisions of the British Treaty.

To this holding the Third Division felt that it could not subscribe, saying: "We say this for the reason that the adminis-

trative interpretation of this question since the days of President Cleveland's administration, when the Honorable Richard Olney was Attorney General, has been to the effect that the countervailing duty provision of the tariff acts was not in conflict with the most-favored-nation clause of treaties."

So, in the instant case the trial tribunal, in effect, held that, so far as the issue here involved is concerned, there is no difference in conditional and unconditional most-favored-nation treaties.

This court has not heretofore had occasion definitely to pass upon that question, nor do we find any decisions upon it by any court other than the Customs Court.

It is true that in the case of Domestic Fuel Corporation v. United States, 74 F. 2d 769, 22 C.C.P.A., Customs, 509, T.D. 47496, we referred to the unconditional character of the German Treaty and quoted certain phrases therefrom, but, in the final anaylsis, our decision there was not predicated upon such *unconditional* character. Our decision in that case would have been the same had the treaty been of the conditional type.

In the Minerva Automobiles, Inc. case, supra, we held it "unnecessary to discuss the difference in the effect of conditional treaties and the effect of unconditional treaties" in the situation there existing.

There are many decisions by the Supreme Court of the United States and by this and other courts and by the executive branch of the Government relative to the application of the most-favored-nation doctrine where expressed in conditional treaties, but their citation here is deemed unnecessary.

That the treaty with Germany was a departure from former practice is a matter of history. It was consciously intended to be such. On the part of the United States the negotiations were conducted under the direction and supervision of the Secretary of State, Honorable Charles E. Hughes. After the treaty had been completed and submitted to the Senate of the United States for its action elaborate hearings were had before that body's Committee on Foreign Relations, beginning January 25, 1924. As a part of the hearings there appears a communication from Mr. Hughes to the Chairman of the Senate Committee on Foreign Relations, from which we quote the following excerpts:

"The Secretary of State.
"Washington, March 13, 1924.
"Hon. Henry Cabot Lodge, Chairman Committee on Foreign Relations, United States Senate.

"My Dear Senator Lodge: I understand that questions have been raised with respect to certain clauses in the treaty with Germany now pending before your committee. In view of the importance of these clauses, I desire to emphasize the considerations which led to their inclusion in the treaty.

"It is hardly necessary for me to refer to the general situation with respect to our commercial treaties. With a number of countries we have no commercial treaties, and the treaties we have should be supplemented and brought up to date. Important subjects are not covered and as to other subjects more precise and definite provisions are required. We are therefore faced with the necessity of negotiating commercial treaties which should be responsive to our needs, and to this end there has been a most careful study of the questions presented. In this examination we have been led to consider the fundamental policies which our commercial treaties should embody. The result of this examination appears in the pending treaty with Germany.

"I understand that the difficulties, which your committee has met, relate to two classes or provisions: (1) Those providing for 'national' treatment, and (2) those providing for 'most-favored-nation' treatment.

\* \* \* \* \* \*

"(2) *Most-favored-nation treatment.*—I suppose that no one would object to the inclusion of the usual most-favored-nation provision in our commercial treaties. I take it for granted that we desire to obtain in our treaties the same benefits for the United States that the other contracting powers give to third States. The question which has arisen with respect to the most-favored-nation clauses in the pending treaty with Germany grows out of the fact that these clauses provide reciprocally for most-favored-nation treatment without regard to the question whether a favored third State shall have been accorded the favor gratuitously or in return for special compensation. In other words, the pending treaty applies what is termed the 'unconditional' most-favored-nation principle. This is indeed a departure from our for-

mer practice, but it is believed to be a wise departure.

"The traditional policy of the United States in respect to most-favored-nation treatment was developed on the theory that privileges and concessions in the field of duties on imports or exports should be granted only in return for privileges and concessions reciprocally accorded. Thus there was almost uniformly written into the treaties to which we became a party the provision that most-favored-nation treatment should be conditional. The benefit of concessions or reductions of duties made to third States by either contracting power should accrue to the other contracting power freely, if freely made to the third State, but only in return for an equivalent if made to the third State for a reciprocal concession or reduction.

"In practice, the application of the principle of granting special concessions in return for special concessions involved the upsetting of the equilibrium of conditions which it was in the interest of this country to maintain. It was the interest and fundamental aim of this country to secure equality of treatment, but the conditional most-favored-nation clause was not in fact productive of equality of treatment and could not guarantee it. It merely promised an opportunity to bargain for such treatment. Moreover, the ascertaining of what might constitute equivalent compensation in the application of the conditional most-favored-nation principle was found to be difficult or impracticable. Reciprocal commercial arrangements were but temporary makeshifts; they caused constant negotiation and created uncertainty. Under present conditions, the expanding foreign commerce of the United States needs a guarantee of equality of treatment which can not be furnished by the conditional form of the most-favored-nation clause.

"While we were persevering in the following of the policy of conditional most-favored-nation treatment, the leading commercial countries of Europe, and in fact most of the countries of the world, adopted and pursued the policy of unconditional most-favored-nation treatment: Each concession which one country made to another became generalized in favor of all countries to which the country making the concession was obligated by treaty to extend most-favored-nation treatment. As the United States attained to a position of first rank as a world power, we, in defense of our essential interests, became an active champion, in fact the foremost champion of the principle of the "open door" in the field of international commercial relations. To be consistent with our professions, and to conserve our interests it has become important that we make our commercial practice square in fact with the theory upon which our policy has been based. This explains the reason why, having examined with most minute care the history of the application of our conditional most-favored-nation principle, the Administration decided to abandon this practice and in its place to adopt the practice of unconditional most-favored-nation treatment. After the matter had been presented to President Harding he wrote me as follows on February 27, 1923:

"'I am well convinced that the adoption of unconditional favored-nation policy is the simpler way to maintain our tariff policy in accordance with the recently-enacted law and is probably the surer way of effectively extending our trade abroad. If you are strongly of this opinion, you may proceed with your negotiations upon the unconditional policy.'

"The tariff act of 1922 contains provisions which differentiated it from previous tariff legislation. Articles 315, 316, and 317 show that Congress realized that we had entered upon a new era, calling for new methods and a new attitude. The time has come for demanding that conditions of commercial competition be placed upon a bsais [basis] which will both assure our own interests and contribute to the peace of the world by eliminating unnecessary economic contentions. As we seek pledges from other foreign countries that they will refrain from practicing discrimination, we must be ready to give such pledges, and history has shown that these pledges can be made adequate only in terms of unconditional most-favored-nation treatment. We should seek simplicity and good will as the fundamental conditions of international commerce.

"There is one apparent misapprehension which I should like to remove. It may be argued that by the most-favored-nation clauses in the pending treaty with Germany we would automatically extend privileges given to Germany to other powers without obtaining the advantages which the treaty with Germany gives to us. This is a mistake. We give to Germany explicitly the unconditional most-favored-na-

tion treatment which she gives to us. We do not give unconditional most-favored-nation treatment to other powers unless they are willing to make with us the same treaty, in substance, that Germany has made. Most-favored-nation treatment would be given to other powers only by virtue of our treaties with them, and these treaties, so far as we have them, do not embrace unconditional most-favored-nation treatment. We can not make treaties with all the powers at the same moment, but if the Senate approves the treaty which we have made with Germany we shall endeavor to negotiate similar treaties with other powers and such other powers· will not obtain unconditional most-favored-nation treatment unless they conclude with us treaties similar to the one with German[y]

\* \* \* \* \* \*"

From the language of the treaty, particularly in the light of the foregoing elaborate construction of it by Mr. Hughes, it seems clear to us that the levy of duties at the rate of 50 per centum ad valorem while similar merchandise was being admitted, or was subject to admission, from other countries at the rate of 30 per centum ad valorem, was in contravention of the treaty's provisions.

It has been stated above that certain reservations were advised by the Senate and accepted by the German Government. These were two in number and read as follows:

"First, that there shall be added to Article I of said treaty the following: 'Nothing herein contained shall be construed to affect existing statutes of either country in relation to the immigration of aliens or the right of either country to enact such statutes.'

"Second, that the fifth paragraph of Article VII and Articles IX and XI shall remain in force for twelve months from the date of exchange of ratification, and if not then terminated on ninety days previous notice shall remain in force until Congress shall enact legislation inconsistent therewith when the same shall automatically lapse at the end of sixty days from such enactment, and on such lapse each high contracting party shall enjoy all the rights which it would have possessed had such paragraph or articles not been embraced in the treaty."

We deem it significant that while making reservations of this character none was made respecting countervailing duties, although many paragraphs of the Tariff Act of 1922 which was then in effect carried provisions for same. Paragraph 371 of that act, 42 Stat. 885, was in the precise language of paragraph 371 of the 1930 act, supra. We think it was clearly understood that the intent and effect of the treaty was to modify such provisions of the tariff act in relation to importations from Germany, and Germany was not required to give compensation therefor in her own laws beyond assuring that merchandise imported from the United States should be treated in the same manner as like merchandise imported from other countries.

The treaty was reciprocal and it was self-executing, requiring no legislation other than its own enactment, so far as any matter here involved was concerned. There is no claim that the rate of duty which Germany was then assessing upon bicycle parts imported from the United States was any higher than the rate imposed upon those parts when imported from other countries, and the fact that such rate was higher than the basic rate imposed by the United States is not of legal moment.

There remains to be considered the contention made by counsel for the Government that the most-favored-nation clause of the treaty with Germany was superseded by the Tariff Act of 1930, specifically (as to the merchandise here involved) by paragraph 371, supra, of the act. As has been indicated, the insistence is that our decision here should be controlled by our decision in the Minerva Automobiles, Inc., case, supra.

We do not agree with this view. The cases are clearly distinguishable. In that case it was held that the conditional most-favored-nation clause of the Belgian Treaty of 1875, 19 Stat. 628, had been superseded, as to the merchandise there involved, by paragraph 369 of the Tariff Act of 1922, 42 Stat. 885. So far as we are able to ascertain, there was no provision of law such as paragraph 369 in effect at the time of the ratification of the Belgian Treaty, hence that treaty did not have the effect of repealing or superseding any prior act of Congress.

When the German Treaty was ratified paragraph 371 of the Tariff Act of 1922 was in effect and the treaty, in our view, superseded it so far as importations from

Germany were concerned, but the paragraph remained in effect as to importations from countries with which we had no commercial treaties or had only treaties of the conditional type. In order that those countries might have the benefit of the normal rate it was necessary that they should compensate by giving to importations from the United States a similar rate. The agreement between the United States and Germany was that each should receive the benefit of the lowest rate granted by it to any third country, "simultaneously and *unconditionally,* without request and *without compensation.*" (Italics ours). It was not required that in order to make applicable the rate of 30 per centum ad valorem on bicycle parts imported from Germany that country should give that rate to importations from the United States. It was only required that Germany admit importations from the United States at the lowest rate granted upon importations from any other country.

Such was the situation when the Tariff Act of 1930 was enacted. That act did not repeal paragraph 371 of the 1922 act, 42 Stat. 885, but continued it. The general repealing clause in the act of 1930 ran only to "All Acts and parts of Acts inconsistent with the provisions of this Act [chapter]." Sec. 651, Tariff Act of 1930, 19 U.S.C.A. § 1651. There remained ample room for the application of paragraph 371 to importations from many countries other than Germany. At the time of the enactment of the 1930 tariff act the German Treaty was the only one of its type which had been ratified and embodied in the statutes at large, and we find no history connected with the passage of the tariff act which indicates any intention on the part of Congress to abrogate or supersede that treaty. It is well established, of course, that where a treaty and an act of Congress are in conflict, the latest in date must prevail. United States v. Lee Yen Tai, 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878. It is equally as well established that repeals by implication are not favored and that in the case of treaties, as in the case of statutes, where provisions "cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court—no purpose to repeal being clearly expressed or indicated —is, if possible, to give effect to both." This principle was so stated as to statutes in the case of Frost v. Wenie, 157 U.S. 46, 58, 15 S.Ct. 532, 537, 39 L.Ed. 614, and the Supreme Court definitely applied it in the case of a treaty in the Lee Yen Tai case, supra.

Obviously the treaty with Germany marked the adoption of a new policy on the part of the United States.[1] The history of the period is replete with statements to that effect, and, as was indicated in the letter of Mr. Hughes, supra, it was contemplated that such new policy would be followed in the negotiation of additional treaties with other countries. We feel justified in concluding that these facts and the expressed intent must have been in the mind of Congress at the time of the enactment of the Tariff Act of 1930, and that had the Congress intended to alter such policy it would have been expressed in the act.

That the repeal of statutes by implication is not favored is familiar law, and the courts uniformly have intimated an even stronger disposition to apply the rule in cases where treaties are involved. In the case of Chew Heong v. United States, 112 U.S. 536, 540, 5 S.Ct. 255, 256, 28 L.Ed. 770, the Supreme Court said: " * * * Aside from the duty imposed by the constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected. And it would be wanting in proper respect for the intelligence and patriotism of a co-ordinate department of the government were it to doubt, for a moment, that these considerations were present in the minds of its members when the legislation in question was enacted."

In view of the foregoing, we are of the opinion that paragraph 371 of the Tariff

---

[1] In a report of the United States Tariff Commission made to Congress on reciprocity and commercial treaties, published in 1919 (Government Printing Office), it is stated, in substance (p. 391), that the "immediate and unconditional" provision had appeared in only three treaties to which the United States had been a party and it appears these had been abrogated long prior to the date of the publication.

Act of 1930, supra, did not repeal or supersede the unconditional most-favored-nation provisions of the treaty with Germany with respect to the merchandise involved, and, since we are of the opinion that the assessment of the duties here complained of was contrary to such provisions, we disagree with the conclusion reached by the Third Division.

Accordingly, the judgment of the United States Customs Court is reversed and the cause remanded for further proceedings in conformity with the views herein expressed.

Reversed and remanded.

JACKSON, Associate Judge, took no part in the consideration or decision of this case.